## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-80032-CR-ALTMAN

**UNITED STATES**,

       *Plaintiff*,

v.

**CHRISTOPHER TAVORRIS WILKINS**,

       *Defendant*.

_____/

## <u>ORDER</u>

Before the Hon. Roy K. Altman:

Two days after he was released from prison to a halfway house, Christopher Wilkins started selling drugs again—at first with help from "CS," his longtime girlfriend, and later by leaning on "GH," her (quondam) friend. But, when CS discovered that Wilkins had taken up with GH, she called the police and told them about Wilkins' drug dealing. She also handed the Government a treasure trove of (extremely) inculpatory pictures and cellphone videos, in which Wilkins can be seen flaunting large amounts of cash and holding—and sometimes pointing—a gun. Armed with this evidence, a federal grand jury indicted Wilkins on charges of (1) possession of ammunition by a conviction felon (Counts 1 and 2); (2) possession of a firearm by a convicted felon (Count 3); (3) conspiracy to distribute a controlled substance (Count 4); and (4) use of a firearm during and in relation to a drug trafficking crime (Count 5). *See* Indictment [ECF No. 1].

After he was indicted, Wilkins reconciled with CS and tried to dissuade her from cooperating with the Government. Although CS initially acceded to these requests, she ultimately changed her mind—her conversion impelled, in part, by the Government's decision to charge her

with aiding and abetting Wilkins' crimes. Now Wilkins' anger bubbled over. Having learned in discovery that CS had reengaged with the Government, his once-loving entreaties turned to threats of violence and death. Not inclined to look the other way, the Government presented these threats to the Grand Jury, which promptly returned a Superseding Indictment, charging Wilkins with two (new) counts of witness tampering. *See* Superseding Indictment [ECF No. 57] (Counts 6 and 7).

And so, the stage was set. At trial, both CS and GH testified against Wilkins—as did two Government experts (one on firearms, the other on videography) and the convicted felon who first introduced Wilkins to the drug trade. Along the way, the Government introduced dozens of exhibits, including guns, bullets, pictures, videos, jail recordings, threatening e-mails, and menacing text messages—all driving towards one ineluctable conclusion: Wilkins' guilt. After several days of this, a federal jury convicted Wilkins of Counts 1, 3, 6, and 7 of the Superseding Indictment—even as it acquitted him of Counts 2, 4, and 5. *See* Jury Verdict [ECF No. 125].

Wilkins now asks the Court to acquit him of Counts 6 and 7—or, in the alternative, for a new trial on those two counts.[1] *See* Motion for Acquittal or for a New Trial (the "Motion") [ECF No. 179]; Government's Response [ECF No. 192].[2] For the following reasons, Wilkins' Motion is **DENIED**.

---

[1] Wilkins was convicted on November 7, 2019, *see* Jury Verdict, but he did not file his Motion until April 30, 2020, *see generally* Mot. He thus waited far longer than the 14 days allotted by Rules 29 and 33. *See* FED. R. CRIM. P. 29(c)(1), 33(b)(2). Recognizing, however, that Wilkins had fired his lawyer—and gotten a new one—the Government has (generously) waived the timeliness bar and now asks the Court to adjudicate the Motion on its merits. *See* Response at 2.

[2] Wilkins never replied.

## THE FACTS[3]

The Defendant, Christopher Wilkins, was released from prison to a halfway house on May 23, 2017. *See* Trial Tr. [ECF Nos. 158–65] at 566. A couple days later, he started selling crack (again) with his then-girlfriend, CS. *Id.* at 567. Most days, the sequence went something like this: CS would pick Wilkins up at the halfway house and drive him to his stepfather's place, where he would grab the drugs he thought he could sell. *Id.* CS would then drive him around from house to house—waiting in the car as Wilkins exchanged drugs for cash. *Id.* at 571–75 (CS explaining how she would wait for Wilkins while he sold drugs). Often, Wilkins would be holding CS's Taurus 9mm semi-automatic pistol as he did so. *Id.* at 574. On one occasion, Wilkins and CS stopped at a Walmart, where Wilkins calmly pointed out the bullets he wanted and then walked alongside her as she paid for them at the counter. *Id.* at 587–88. By selling drugs, possessing a gun and ammunition, and even riding in a car, Wilkins was flagrantly violating the terms of his release. *Id.* at 640.

In August 2017, everything changed.[4] At around that time, CS learned that Wilkins had begun dating her best friend, "GH." *Id.* at 636. As retaliation, CS posted on her Facebook page several inculpatory pictures of Wilkins holding what appeared to be a firearm (and otherwise

---

[3] Because Wilkins only challenges his convictions on Counts 6 and 7, we focus on the facts related to those two counts.

[4] This is (admittedly) six months before the conduct that's charged in Counts 6 and 7 (which span from February through September of 2018). But this conduct is plainly relevant both because it adds context to the relationship and because it supports the Government's contention that "a reasonable recipient, familiar with the context of the communication would interpret it as a threat," as required by 18 U.S.C. § 1512(b). *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017). In other words, it's relevant to show that CS understood Wilkins (both how he spoke and what he meant), that she knew what he was capable of, and that she was afraid of him. After all, CS's perception of Wilkins as a raging, vindictive, and dangerous ex-lover didn't spring into existence *ex nihilo*; it was, rather—as these text messages show—the product of many months (if not years) of intimidation.

violating the terms and conditions of his release). *Id.* at 640. Wilkins demanded that she "erase those pictures." *Id.* When she refused, he told her to "go get a black dress, hoe"—which CS interpreted to mean "that he was gonna kill me, go get a black dress [for the funeral]." *Id.* at 641–42. Her response—"I'm going to the police station right now," *id.* at 642—didn't assuage his anger: "I control who lives or dies, bitch," he exclaimed, in a text message that made CS feel "scared," *id.*

It gets worse. In a subsequent exchange, Wilkins called CS a "police ass hoe"—which she interpreted to mean "that I'm snitching"—and warned her: "when I get out, you all better leave da state." *Id.* at 642–43. Shortly after this last message, though, Wilkins quarreled with the director of the halfway house—and, as a result, was sent back to prison for a week. *Id.* at 1161.

On September 22, 2017, Wilkins was re-released to the halfway house and, soon thereafter, began dating "GH" in earnest. *Id.* at 576. CS discovered the relationship when the pair started posting pictures of themselves—together—on Facebook. *Id.* CS—who "was in love with [the Defendant]," *id.* at 576–77—called Crime Stoppers to report on Wilkins' criminal activity. *Id.* at 577. As a result of that call, CS eventually met with Special Agent Sara Connors of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). *Id.* At that first meeting, CS showed Agent Connors photos and videos of Wilkins holding (and flashing) guns, ammunition, drugs, and large amounts of cash. *Id.* The following month—October 2017—CS told the Grand Jury that, while possessing a loaded firearm, Wilkins was selling drugs from his halfway house. *Id.* at 580. In doing so, however, CS conveniently omitted any mention of her own involvement in Wilkins' crimes. *Id.* So, for example, she didn't tell either Agent Connors or the Grand Jury that *she* was Wilkins' driver, that the gun he was toting around was hers, or that the ammunition in that gun had been purchased (for him) by her. *Id.*

Around this time (October 2017), Wilkins broke up with GH and reached out to CS. *Id.* at 581. He told her that he loved her and insisted that he wanted her back. *Id.* She soon acquiesced, *id.*, and told him all about her prior cooperation with the Government, *id.* at 634. Nonplussed, Wilkins told her to "[s]top talking to them [the Government] and get a lawyer" and assured her that she was "not gonna get in trouble." *Id.*

On September 28, 2017, Wilkins was arrested again.[5] From jail, Wilkins would both call CS (under the jail account associated with another inmate, Robert Harzog), *id.* at 670, and send her letters, text messages, and "TruLincs" emails, *see* Government Exhibits [ECF No. 133-1] at 168; Trial Tr. at 691, 712. Initially, Wilkins seemed confident that he'd be acquitted. On February 27, 2018, for instance, he told CS: "I pick a jury man, that's over with. They'll throw that shit out before I go to trial. If it's going off hearsay, you don't got no pictures of me in a transaction, you don't got no drugs, you don't got no gun at the scene or don't have a physical gun to show in court. There is no case, man. It's just hearsay. That's what the feds run off of." Trial Tr. at 671; Government Exhibits at 56.

When CS tried to point out that the Government had more than mere "hearsay," he often denied reality. "They have—they have you—that shit that [GH] gave you," she said on February 27, 2018, referring to a second gun. Trial Tr. at 671–72. "That ain't mine," he insisted. "[T]hey don't got nothing [GH] gave them. That's not mine." *Id.* What about the photos (she wondered)? "That don't mean nothing," he retorted. "That can be—that's Snapchat. That shit edited, baby. They could have wha the fuck they wanna go, man. You already know, today's society everybody

---

[5] To summarize the sequence, then: Wilkins was first released from prison to the halfway house on May 23, 2017. *See* Trial Tr. at 566. He then returned to jail for a week (from September 15 to 22, 2017), *see id.* at 576, and he went back to jail on September 28, 2017, where he's been ever since, *id.* at 580–81.

don't take pictures off camera phones. They pictures off Snapchat. Snapchat is an edited site." *Id.*; Government Exhibits at 57. And what of the photos of him holding the gun? "That's my son got BB guns, pellet guns, that shit don't mean nothing, man." Trial Tr. at 672–73. What (she asked) did he have to say about the video of the two of them buying ammunition together at the Walmart? "I wasn't in Walmart buying no damn bullets, and you weren't either. That's the thing. They don't—none of that—that's bullshit. You see what I'm saying?" *Id.* at 679. Not true, she told him: The Government *did* have the video. "How they get the video?" he demanded to know. "Who told them that? How'd they get the dates? Somebody told them." *Id.* at 682.

When Wilkins learned that GH was cooperating with the Government, he sent CS a letter, in which he said: "I'm trying to stay focus, because Lord knows what I'm a do to dat bitch [GH]. I got her entire blood line. Fuck them all. They wanna scream I am dis and dat. We gonna see how they gonna explain that mess that coming their way. Ain't shit free. Rocking my way. It's a price behind everything. A mother fucker gone learn watch." *Id.* at 712 (CS reading Wilkins' March 21, 2018 letter); Government Exhibits at 168. From the letter, CS understood that Wilkins "was gonna go after [GH]." Trial Tr. at 712. Later in the letter, he added that, "[i]f they had me on anything, you can best believe I would have been charged, meaning they wouldn't need you or [GH] lying ass statements. That's why you need to tighten up," which CS interpreted to mean that she should "stop listening to [ATF]." *Id.*

When CS implored Wilkins not to go to trial, explaining that she didn't want to have to testify against him, *id.* at 674, he told her: "You don't have to go . . . . you don't have to. That's the thing. You don't have to go. You don't even have to—you keep talking about what they telling—you don't have to go. That's—it's not a law." *Id.* at 675–76. When CS insisted that she *did* have to testify, he wouldn't budge: "That's a lie, man. You need a fucking lawyer, man. You

don't have to go, and if you do go, you get up there and be like 'Look, I don't wanna go. I don't know. I don't. I don't wanna deal with this.' That's that. You have an opinion, bro. You acting like a bitch put a gun to your head." Government Exhibits at 62.

This theme—Wilkins urging CS not to cooperate and not to testify—popped up over and over in their conversations: "She [Agent Connors] talking about an ongoing investigation. Yeah, bitch, because, you know, a grand jury ain't gonna indict me off that shit. Unless you [referring to CS] go to the grand jury with her." Trial Tr. at 683. He continued: "There's no law saying you got to cooperate with the feds . . . . That why you gotta get an attorney. I done told you four, five days straight, man. Call my sister." *Id.* at 684; *see also id.* at 688 ("Just call my sister, and you can fix it."). According to CS, "Wilkins wanted me to call his sister and talk to their lawyer and everything, so they could fix the problem. . . . [H]e was just telling me not to talk to the—Sara Connor [sic]." *Id.* Pressing somewhat harder, he assured CS that "[y]ou can switch your number, leave the state, they can't come find you." *Id.* at 689.

After reconciling with Wilkins, CS began lying to Agent Connors—both about her contact with Wilkins and about how he came to have the gun (and the bullets) depicted in the photos. *Id.* at 1158. Agent Connors only realized the deception in February 2018, when Wilkins called to tell her to stop "harassing" CS. *Id.* at 1184. Confused by the substance of that call, Agent Connors launched an investigation into Wilkins' contacts with CS—which revealed the vast trove of jail calls between the two. *Id.* Wilkins, it turned out, had hoped to elude detection by calling CS under a different inmate's phone account. *Id.* at 1187. But Agent Connors easily foiled the trick by looking for jail calls to CS's number. *See id.* ("I selected a few numbers that Mr. Wilkins calls, and I asked them to run calls placed by any inmate to those phone numbers."). Agent Connors' investigation also revealed that CS had lied to the agents about her own complicity in Wilkins'

7

crimes. *Id.* at 1188. In June 2018, therefore, the Grand Jury indicted CS for her role in aiding and abetting Wilkins. *Id.* at 582. The indictment evidently had its intended effect. Soon after her arrest, CS (through her court-appointed lawyer) resumed her cooperation with ATF. *Id.* at 697.

This entente with the Government enraged Wilkins. Having learned of CS's renewed cooperation, Wilkins sent a barrage of threatening emails that left little doubt about his intentions. So, for instance, on July 23, 2018, he wrote: "I got all the documents of you talking and im keeping track of everything. . . . Well, since it's going to be like dis, I advise you to leave the state"—a message she interpreted to mean that "he's gonna send people after me." *Id.* at 700. In that same email, he warned her: "Because those guys know what you filed and told the agents. Since you are playing games, and we have all the recording statements. It's on the internet right now. So, you cannot run or hide." *Id.* at 701. CS testified unambiguously that this email made her feel, in a word, "scared." *Id.* Indeed, because CS no longer felt safe in her home, and, to secure her physical safety, the Government moved her to a new apartment. *Id.* at 698.

Even after CS moved, though, Wilkins continued to harass and threaten her. In one such text (on September 21, 2018), he called her a "stupid bitch" and menacingly wondered: "[O]h, so you're moving and think I won't find you? Yeah, my people will let me know exactly where you are at. So I'll be at your doorstep to see my son, little nigga. Oh, yeah, I can stop by you dad house also." *Id.* at 702–04. In a separate exchange (the next day), he warned her: "Lol you are moving, and thinking smart huh? Yea get outta florida why u can bruh. why are you scared when you see my people? They know whats up and got all the paperwork yea its best you leave bruh becuz shit hit the fan and ah nigga like me ready to do a life sentence bout my respect." Government Exhibits at 105. One day after that, doubling down on this theme, he sent her the following message: "U Know whats up Lil nigga Im comin" *Id.* at 106.

Not content with communicating by text, in August 2018, Wilkins turned to epistolary:

> I got all your address. I know you moved, and I know how to get every new address location, just like I get all your paperwork or the Internet. I know you can't leave the Southern District of Florida, which means I'll be right on yo ass before December 25 of 2018. . .  You playing da game fucked up, like think shit's sweet or think I'm pussy. Man, I'm cut all street, my nigga, it's all gas no brakes when it comes to **dis wilding shit**. So, you better **act right**. . .  And call my momma ASAP and tell her what's going on, because if not, I'm a take it as some disrespect shit and turn up on your ass. You know I got the juice. Me and my niggas know what's up. Bros over hoes. . .  I'm really starting to feel like you are against me, and if it's like dat, you will be put in the category of them fuck niggas I'm a get when I catch them. So what's it gonna be?

*Id*. at 172; Trial Tr. at 717–727 (August 2018 letter from Wilkins to CS) (emphasis added).

CS (understandably) construed the letter as a threat and, again, testified that it scared her. *See, e.g.*, Trial Tr. at 720, 722, 724, 726. To "act right," she said, meant to stop cooperating or else "he's coming after me" with "dis wilding shit"—his way of making clear "that he's gonna be crazy when he comes." *Id*. at 720.

The trial lasted five days. At the end of the Government's case, Wilkins' lawyer moved, *ore tenus*, for a judgment of acquittal under Rule 29, arguing that the evidence was insufficient on all counts. *Id*. at 1192. As to Counts 6 and 7, he characterized the jail calls as, not witness tampering, but perfectly innocent advice about the virtues of getting a lawyer. *Id.* at 1193. The Court denied the motion. Viewing the evidence in the light most favorable to the Government, the Court said, a reasonable jury could conclude that the jail calls—particularly when combined with the text messages, the emails, and the letter—were intended to intimidate CS out of testifying. *Id.* at 1194–95. As the Court explained: "I'm not entitled to make credibility judgments at this phase"—and so, "viewing the evidence in the light most favorable to the government, which is what I have to do at this phase of the proceeding, isn't that [the proposition that Wilkins was trying to dissuade CS from cooperating] a fair interpretation of the evidence?" *Id.* at 1195–96. At this,

counsel candidly conceded that, "[b]ased upon some of the evidence that the Court has cited to, that could be a fair inference." *Id.* at 1196. After a day or so of deliberations, the jury convicted Wilkins of Counts 1, 3, 6, and 7 of the Superseding Indictment. *See* Jury Verdict.

In this Motion, Wilkins admits that "the Government clearly had sufficient evidence to support the convictions on the remaining counts," but he argues that "it cannot be said the testimony of CS was reliable enough to justify the convictions on either Counts 6 or 7." Mot. at 11.

## THE LAW

Rule 29 allows the Court to direct a verdict for a defendant, either on the defendant's motion or *sua sponte*, if the evidence is insufficient to sustain a conviction. *See* FED. R. CRIM. P. 29. A defendant can raise this motion either at the close of the government's case, FED R. CRIM. P. 29(a), or after a jury verdict, FED. R. CRIM. P. 29(c). As relevant here, "the sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction." *United States v. Miranda*, 425 F.3d 953, 962 (11th Cir. 2005). In adjudicating a Rule 29 motion, the Court must examine the evidence "in a light most favorable to the government" and make "all credibility choices . . . in support of the jury's verdict." *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004). Ultimately, the question is "whether the evidence . . . [is] sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *Id*. The Eleventh Circuit will thus "uphold the denial of a Rule 29 motion if we determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (cleaned up). If the Court elects to grant the motion, it "may set aside the verdict and enter an acquittal." FED. R. CRIM. P. 29(c).

Rule 33, on the other hand, allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). When, as here, a motion for a new trial is premised on the insufficiency of the evidence, "the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (cleaned up). But the Eleventh Circuit "more closely scrutinize[s] a court's grant of a new trial." *Id.* at 1336. And, apropos of this Motion, "the grant of a new trial based on the weight of the evidence is more closely scrutinized than the grant of a new trial on other grounds." *Id.* (cleaned up). "Motions for new trials based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really exceptional cases." *Id.* at 1336–37 (cleaned up).

## ANALYSIS

Wilkins here challenges the witness-tampering convictions (Counts 6 and 7). In Count 6, the Grand Jury alleged that:

> From at least as early as on or about February 26, 2018, through on or about September 23, 2018, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant CHRISTOPHER TAVORRIS WILKINS, did knowingly intimidate, threaten, corruptly persuade, and engage in misleading conduct, and attempt to intimidate, threaten, corruptly persuade, and engage in misleading conduct, towards CS, with the intent to influence, delay, and prevent the testimony of CS, in an official proceeding, that is, the Grand Jury's Investigation of CHRISTOPHER TAVORRIS WILKINS. In violation of Title 18, United States Code, Section 1512(b).

11

Superseding Indictment at 4. Count 7 is identical—except that, in that count, the last sentence was changed to read: "with intent to hinder, delay, and prevent the communication by CS to a law enforcement officer of the United States, of information relating to the commission of a Federal offense. In violation of Title 18, United States Code, Section 1512(b)." *Id.* at 4–5. In other words, Wilkins was charged with violating 18 U.S.C. § 1512(b) in two ways: by seeking to prevent CS from testifying in front of the Grand Jury (Count 6) and by attempting to dissuade CS from cooperating with the Government (Count 7).

### A.    Rule 29

Because the Court has already denied Wilkins' in-trial Rule 29 motion on this same issue, *see* Trial Tr. at 1192–96, this is actually his motion for reconsideration. "Rule 59 and Rule 60(b) are civil remedies, and, therefore, cannot be used to obtain relief from a judgment in a criminal case." *Serrano v. United States*, 411 F. App'x 253, 255 (11th Cir. 2011). That said, "[a]lthough the Federal Rules of Criminal Procedure do not specifically authorize motions for reconsideration, both the Supreme Court and this Court have permitted parties to file such motions in criminal cases." *Id.*

"The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007); *see also United States v. Prine*, 2013 WL 2896842, at *1 (S.D. Ala. June 13, 2013) ("Generally, courts have recognized three grounds which justify the reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice."). Wilkins alleges neither a change in the law nor any new evidence. *See generally* Mot. He must therefore show that granting his Motion is necessary to "correct clear error or manifest injustice." *Prine*, 2013 WL 2896842, at *1. This he cannot do.

But, even if the deck were less stacked against him—that is, even if Wilkins were advancing his claim here for the first time—his Motion would still fail. Rule 29, remember, requires the Court to examine the evidence "in a light most favorable to the government" and demands that "all credibility choices must be made in support of the jury's verdict." *Williams*, 390 F.3d at 1324.

> The witness-tampering statute with which Wilkins was charged punishes anyone who
>
> knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding; or [Subsection 2 purposefully omitted]; or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings[.]

18 U.S.C. § 1512(b).

The crime thus has two elements. The first (the *actus reus*) requires the Government to show that the defendant "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person . . . ." The second (the *mens rea*) requires the Government to establish the defendant's intent: why, it asks, did he intimidate, threaten, corruptly persuade, or engage in misleading conduct towards the victim? On this question, the statute provides three avenues by which the Government might prove the defendant's intent—only two of which are relevant here. Under § 1512(b)(1) (our Count 6), the Government must show that the defendant intended "to influence, delay or prevent the testimony of any person in an official proceeding[.]"[6] And, under § 1512(b)(3) (our Count 7), the

---

[6] "An 'official proceeding,' as referred to in § 1512(b), is explicitly defined in 18 U.S.C. § 1515 to include a federal grand jury proceeding." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1040 (11th Cir. 2000).

Government must demonstrate that the defendant intended to "hinder, delay, or prevent the communication to a law enforcement officer[7] . . . [of] information relating to the commission or possible commission of a Federal offense or violation of conditions or probation, supervised release, parole, or release pending judicial proceedings . . . ." ).[8]

Note that § 1512(b) criminalizes not only the threat of force, but also "sheer persuasion without the use of physical or economic threat, as long as one does so with a corrupt purpose." *McAndrew*, 206 F.3d at 1040. And, importantly, in assessing whether a statement constitutes a threat, the Court must review the statement objectively. *See Davis*, 854 F.3d at 1292. Thus, "if a reasonable recipient, familiar with the context of the communication would interpret it as a threat, the issue should go to the jury." *Id.* at 1293; *see also id.* ("Regardless of whether D.D. actually felt threatened, the jury was free to conclude that Davis knowingly used corrupt persuasion that was intended to prevent D.D.'s testimony.").

Under either theory, the Government satisfied both elements of § 1512(b) here.

CS's testimony shuts the door on the first element. CS was an imperfect witness, to be sure. She admitted to lying to the grand jury, Trial Tr. at 738, and—at various times in the investigation—Agent Connors knew that CS was lying to *her*, *id.* at 1158. But, under Rule 29, the Court must make all credibility choices in the light most favorable to the verdict, *see Williams*, 390 F.3d at 1324—which, for our purposes, means crediting her testimony and assuming its truth.

---

[7] "ATF is a federal agency under the United States Department of Justice." *Smalley v. Holder*, 2010 WL 3718288, at *1 n.2 (S.D. Fla. Sept. 21, 2010).

[8] The Eleventh Circuit has split off a third element only for § 1512(b)(3). And so, when proceeding under that subsection, the Government must show that the defendant harbored the "intent to hinder, delay or prevent the communication of information to a federal official, (3) about the commission or possible commission of a federal crime." *United States v. Kaley*, 760 F. App'x 667, 675 (11th Cir. 2019). But, because neither side disputes the self-evident proposition that what Wilkins wanted most—what he was hoping for—was to prevent CS from relaying information about a federal crime, we mention this third element here only in passing.

If we do that—q.v. CS's interpretation of Wilkins' communications with her—there can be no doubt but that Wilkins was intimidating CS into doing something he wanted her to do. And his only defense here—that he was using tough talk, not to dissuade her from cooperating, but to induce her to get a lawyer, Mot. at 10—is really an argument about the second element and is, thus, quite beside the point as to this first element.

But, even discounting *everything* CS said, the Government adduced overwhelming objective evidence—calls, text messages, emails, and (of course) the letter—of Wilkins' pervasive and unabashed course of witness tampering. Now, some of these statements—it's true—weren't explicitly menacing, as when he (falsely) declared: "That's a lie, man. You need a fucking lawyer, man. You don't have to go, and if you do go, you get up there and be like 'Look, I don't wanna go. I don't know. I don't. I don't wanna deal with this.' That's that. You have an opinion, bro. You acting like a bitch put a gun to your head." Government Exhibits at 62. One could construe this statement as an innocuous suggestion from an ex-boyfriend. But, when viewed in context—the ex-boyfriend is in jail, and the woman he's imploring not to testify is the Government's star witness against him—there's *at least* a reasonable inference that the statement was intended to "corruptly persuade." And, since Rule 29 requires the Court to examine the evidence "in a light most favorable to the government," *Williams*, 390 F.3d at 1324, the Court must accept this second reading—which, of course, supports the jury's verdict.

But there's just so much more. As we've documented, Wilkins told CS: "I got all the documents of you talking and im keeping track of everything. . . . Well, since it's going to be like dis, I advise you to leave the state." Trial Tr. at 700. And, after CS was moved (for her own safety), Wilkins boasted: "[O]h, so you're moving and think I won't find you? Yeah, my people will let me know exactly where you are at. So I'll be at your doorstep to see my son, little nigga. Oh, yeah,

I can stop by you dad house also." *Id.* at 703. And then there's this: "Lol you are moving, and thinking smart huh? Yea get outta florida why u can bruh. why are you scared when you see my people? They know whats up and got all the paperwork yea its best you leave bruh becuz shit hit the fan and ah nigga like me *ready to do a life sentence* bout my respect." Government Exhibits at 105 (emphasis added). And this: "U Know whats up Lil nigga Im comin." *Id.* at 106.

CS understandably testified that these statements scared her. *See* Trial Tr. at 700. But the Government didn't need CS for that proposition, *see Davis*, 854 F.3d at 1293 (courts should assess the threatening nature of statements objectively), because these statements are self-evidently menacing. There really isn't any way to interpret the phrase "ah nigga like me ready to do a life sentence bout my respect," *see* Government Exhibits at 105, other than to accept that the speaker is willing to go to jail for life to vindicate his "respect"—presumably because the crime he intends to perpetrate is either murder or something (almost) as violent. The same goes for unambiguous comments like "oh, so you're moving and think I won't find you? Yeah, my people will let me know exactly where you are at"; or "Yea get outta florida why u can bruh"; and "U Know whats up Lil nigga Im comin"; and especially: "You playing da game fucked up, like think shit's sweet or think I'm pussy. Man, I'm cut all street, my nigga, it's all gas no brakes when it comes to dis wilding shit. So, you better act right. . . And call my momma ASAP and tell her what's going on, because if not, I'm a take it as some disrespect shit and turn up on your ass. You know I got the juice. Me and my niggas know what's up. Bros over hoes. . . I'm really starting to feel like you are against me, and if it's like dat, you will be put in the category of them fuck niggas I'm a get when I catch them." The Court, in short, will not reverse the jury's finding that the Government met the first element of Counts 6 and 7.

Nor does Wilkins fare any better on the second element. To meet its burden on Count 6, the Government had to establish that, by his comments, Wilkins intended to prevent CS from testifying before the Grand Jury. To prevail on Count 7, the Government had to prove that, with his threats, Wilkins intended to prevent CS from giving "information" about "a Federal offense" to a "law enforcement officer" (here, Agent Connors).

The first one's easy. Wilkins, after all, knew that CS was planning on testifying before the Grand Jury and tried to persuade her not to. *See* Trial Tr. at 683 ("She [Agent Connors] talking about an ongoing investigation. Yeah, bitch, because, you know, a grand jury ain't gonna indict me off that shit. Unless you [CS] go to the grand jury with her."). The jury was entitled to construe this last sentence as a not-so-implicit suggestion that CS not testify—especially given the many other times in which Wilkins expressly admonished CS not to testify. *See, e.g.*, *id.* at 675–76 ("You don't have to go . . . . you don't have to. That's the thing. You don't have to go. You don't even have to—you keep talking about what they telling—you don't have to go. That's—it's not a law."); *see also* Government Exhibits at 62 ("That's a lie, man. You need a fucking lawyer, man. You don't have to go, and if you do go, you get up there and be like 'Look, I don't wanna go. I don't know. I don't. I don't wanna deal with this.' That's that. You have an opinion, bro. You acting like a bitch put a gun to your head."). Viewing this evidence in the light most favorable to the Government, the Court agrees that the Government has satisfied the second (*mens rea*) element of Count 6.

The evidence as to Count 7 was similar—and no less compelling. Wilkins repeatedly told CS that "[t]here's no law saying you got to cooperate with the feds." Trial Tr. at 684. He even suggested that "[y]ou can switch your number, leave the state, they can't come find you." *Id.* at 689. When Wilkins learned that CS *had* spoken with law enforcement, he turned up the heat—

switching from (il)legal advice to outright intimidation: "Because those guys know what you filed and told the agents. Since you are playing games, and we have all the recording statements. It's on the internet right now. So, you cannot run or hide." *Id.* at 701. Wilkins' intentions are unmistakable: He was trying to dissuade CS from cooperating with Agent Connors—precisely as the Government alleged. But, again, even if this evidence could go either way, the Court would have to resolve that ambiguity in the light most favorable to the Government. *See Williams*, 390 F.3d at 1324.

> In the end, as the Court explained in denying Wilkins' original Rule 29 motion:
>
> In light of the other communications. . . —the email . . . messages in which he was clearly trying to scare and intimidate her[,] [i]sn't it a fair, reasonable interpretation in light of that evidence that at first, he was trying to dissuade her from cooperating with them, and then when that didn't work, he was trying to threaten her against cooperating with them? . . . Even if we're looking only at the calls, and then subsequent to the calls, the Trulincs communications and the letters that were sent, isn't there a—isn't it a fair interpretation to say he tried to dissuade her from cooperating in the calls, he found out later that didn't work, so he upped the ante, so to speak, and decided to try to threaten her in the letters and emails against cooperating with the government?

Trial Tr. at 1195–96.[9] In response to this question, Wilkins' lawyer candidly conceded that, "based on some of the evidence that the Court has cited to, that could be a fair inference." *Id.* That's really the end of the matter.

---

[9] In denying the first Rule 29 motion, the Court added:

> With respect to Counts 6 and 7, which I've just articulated, I think I'm going to deny your motion, because viewed in the light most favorable to the government, I think it's a fair and reasonable inference to draw that Mr. Wilkins was, in those phone calls, trying to dissuade her from cooperating with the government when he knew that the government was investigating the case, and then later, when he realized that that wasn't working, that he upped his strategy, so to speak, by threatening and intimidating her and trying to scare her away from cooperating with the government.

Trial Tr. at 1197.

Against all this, Wilkins advances three arguments—all unavailing.

*First*, he contends that his communications could not have been designed to intimidate, threaten, or corruptly persuade CS because he was simply dissuading her from doing something she already didn't want to do. Mot. at 9. In Wilkins' view, then, a defendant only violates § 1512(b) when he persuades an otherwise-willing witness not to testify.

Wilkins, of course, cites no case for this novel reading of the statute. Nor can he. Section 1512(b), after all, criminalizes even the *attempt* to tamper. *See* 18 U.S.C. § 1512(b) ("knowingly uses intimidation, threatens, or corruptly persuades another person, *or attempts to do so . . . .*") (emphasis added). The statute thus focuses exclusively on *the defendant's* intentions. Indeed, one would search in vain for any reference in the statute to *the victim's* state of mind—this lacuna providing compelling evidence that the victim's prior willingness is wholly irrelevant to the calculus. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012) ("Nothing is to be added to what the text states or reasonably implies."). It should therefore come as no surprise that the Eleventh Circuit's Pattern Jury Instructions for § 1512(b) never mention Wilkins' proffered victim's-state-of-mind element. *See* Eleventh Circuit Pattern Jury Instructions O59.2 (2020) ("The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt: (1) the person described in the indictment was [a witness] [scheduled to be a witness] in this Court; (2) the Defendant used [intimidation] [physical force] [threats] against that person; and (3) the Defendant acted knowingly and intended to [influence] [delay] [prevent] the witness's testimony.").

And this makes sense. It's blackletter law that a defendant can be found guilty of attempting to commit a crime *even if* the person with whom he intends to collaborate has absolutely no intention of participating in the offense—as, for instance, when the purported participant is an

undercover officer.[10] Thus, a defendant who intends to induce a minor into sexual activity is guilty of attempt even when the "minor" he thought he was inducing was an adult undercover[11]—just as a defendant who intends to buy drugs from an undercover is guilty of attempt even when it's revealed that the "drugs" he intended to purchase were fake.[12] The focus—as ever—is on *the defendant's* state of mind.

The law could hardly be otherwise. Cooperating witnesses, after all, are rarely (if ever) eager to cooperate—much less to testify in an official proceeding. To penalize only those defendants who intimidate *willing* witnesses would thus exclude from the statute's ambit a wide swath (perhaps even a substantial majority) of its violators. Such a rule would only encourage defendants to threaten those witnesses who are the most susceptible to intimidation—i.e., the ones who were already scared enough (or apathetic enough) to hope to avoid testifying in the first place. This cannot be the law. Far from creating some illogical safe harbor for defendants who threaten *unwilling* witnesses, then, § 1512(b) acts as both a shield (protecting the Government's

---

[10] *See, e.g.*, *United States v. Hernandez*, 423 F. App'x 935, 936 (11th Cir. 2011) (affirming denial of Rule 29 motion where "Hernandez used his cellular telephone to instruct an undercover officer—posing as a hired hit man—to kill another individual. . . . [H]is crime was complete after that first call."); *United States v. Nelson*, 334 F. App'x 209, 212 (11th Cir. 2009) ("[A] defendant's offense need not involve an actual minor in order to support a conviction for attempt under § 2422(b), . . . it [is] sufficient that the defendant believed that his offense involved a minor."); *United States v. McDowell*, 705 F.2d 426, 428 (11th Cir. 1983) ("McDowell's refusal to purchase the sham cocaine because of doubts as to its genuineness or quality is also consistent with a criminal enterprise. While the government's use of sham cocaine is not consistent with criminality, the acts of the government are not a relevant reflection of [McDowell's] underlying intent.") (cleaned up).
[11] *See, e.g.*, *United States v. Muentes*, 316 F. App'x 921, 924 (11th Cir. 2009) ("The relevant intent is Muentes' intent to induce a minor to engage in unlawful sex, not whether a minor was actually induced."); *United States v. Murrell*, 368 F.3d 1283, 1287 (11th Cir. 2004) ("Murrell was convicted for *attempt* under the statute [attempting to engage a minor in unlawful sexual activity] because there was no actual minor involved who could have been influenced.") (emphasis added)
[12] *See, e.g.*, *United States v. Carothers*, 121 F.3d 659, 662 (11th Cir. 1997) ("Simply because Defendant received no illegal drugs from his supplier on this occasion does not provide a defense to a crime for which his objective acts clearly demonstrate an intent to commit.").

investigative powers) and a sword (punishing defendants, like Wilkins, who are brazen enough to interfere with the Government's legitimate inquests).

It's also not clear what Wilkins thinks "voluntary" even means in this context. As a legal matter, a person voluntarily does something if she does it freely and intentionally. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973) ("The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'" (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1860)). In this case, the evidence is clear that CS began cooperating with law enforcement of her own volition—apparently because she was upset about Wilkins' relationship with GH. *See* Trial Tr. at 577. There's nothing involuntary about that. Nor can Wilkins credibly argue that her subsequent decision to resume her cooperation—after her indictment—was anything but intentional. CS assessed her options and made the choice that (she believed) was best for her in the circumstances.[13] That one of those circumstances was a pending indictment doesn't render her

---

[13] *Cf.* Thomas Hobbes, OF LIBERTY AND NECESSITY §§ 27–28 ("I conceive that in all deliberations, that is to say, in all alternate succession of contrary appetites, the last is that which we call the will, and is immediately next before the doing of the action, or next before the doing of it become impossible. . . . [T]hat those actions which a man is said to do upon deliberation are said to be voluntary and done upon choice and election, so that voluntary action and action proceeding from election is the same thing; and that of a voluntary agent it is all one to say he is free, and to say he has not made an end of deliberating."); John Locke, AN ESSAY CONCERNING HUMAN UNDERSTANDING, Ch. 21, § 8, Pg. 237 (1690) ("So far as a Man has a power to think, or not to think; to move, or not to move, according to the preference or direction of his own mind, so far is a Man Free."); Peter van Inwagen, *The Incompatibility of Free Will and Determinism*, 28 PHIL. STUDIES 185, 188 (1975) ("[A]lmost all philosophers agree that a necessary condition for holding an agent responsible for an act is believing that an agent *could have* refrained from performing that act.") (emphasis in original).

decision any less voluntary than (for instance) any run-of-the-mill decision to plead guilty—a decision that, it's almost tautological to say, necessarily springs from the coercive effect of the indictment itself.[14] In other words, even if CS's intentions were relevant to this inquiry, Wilkins' argument would still fail, because—indictment or not—she did willingly cooperate against him. Now, she may not have liked it; she may even have disliked it; she certainly would rather have been someplace else. But Wilkins doesn't contend that these likes or wants can make the least bit of difference here.

The Eleventh Circuit's recent decision in *Kaley* is instructive. The defendant in that case had called a meeting of her coconspirators, at which "the group discussed concealing that they were engaged in the theft of PMDs [prescription medical devices] and agreed to tell a uniform story if question[ed]." *Kaley*, 760 F. App'x at 676. Specifically, at that meeting, the defendant "instructed coconspirators to refuse to speak to law-enforcement officers, and directed coconspirators who did to stick to a false narrative." *Id.* The defendant was convicted of violating § 1512(b)(3). On appeal, she challenged the sufficiency of the Government's evidence, and the

---

[14] *Cf. North Carolina v. Alford*, 400 U.S. 25, 31 (1970) ("The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. That he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage.") (internal citations omitted); *Brady v. United States*, 397 U.S. 742, 750 (1970) ("The State to some degree encourages pleas of guilty at every important step in the criminal process. For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction.").

Eleventh Circuit affirmed. "To establish a violation of § 1512(b)(3)," the court said, "the government merely had to show that Kaley attempted to persuade a person to hinder or prevent the communication of information to a federal official. The jury could reasonably have believed the witnesses when they testified that Kaley called various meetings, instructed coconspirators to refuse to speak to law-enforcement officers, and directed coconspirators who did to stick to a false narrative." *Id*. at 677. There's (notably) no mention in *Kaley* of the degree of the *co-conspirators*' willingness to participate in the obstruction; what mattered was *the defendant's* intention.

More probative, perhaps, was the Eleventh Circuit's decision in *United States v. Davis*. In that case, a convicted felon was accused of possessing a firearm. 854 F.3d at 1292. When he learned that his daughter was set to cooperate against him, he implored her not to. *Id*. at 1285. The daughter ultimately testified—though she claimed that the father's importuning had had no effect on her. *Id*. at 1292. Nevertheless, the jury convicted the defendant of violating 18 U.S.C. §§ 1503 (obstruction of justice) and, more relevant here, 1512(b). *Id*. "On appeal, Davis argue[d] that, because D.D. testified that she did not feel threatened by Davis, and told the jury that she did not feel that her father 'was pressing her to lie or not testify,' the evidence against him was 'fatally undermined.'" *Id*. In rejecting this argument, the Eleventh Circuit reasoned that, under either statute, "the relevant inquiry is not whether D.D. actually felt threatened." *Id*. Instead, as we've explained, the focus was on *the defendant's* behavior and *the defendant's* intentions. *Id*. If the evidence was sufficient in *Davis*—where the victim admitted that she did *not* feel threatened— then it must be sufficient here given CS's unambiguous testimony that Wilkins' threats *did* frighten her.

Putting all of this aside, though, Wilkins' contention ignores the simple fact that § 1512(b) prohibits anyone from "engag[ing] in misleading conduct toward another person"—a proscription

that, on its face, can have nothing to do with the victim's willingness to cooperate. The question under this last prong of the statute is simple and straightforward: Did the defendant lie? And Wilkins did falsely tell CS that "[y]ou don't have to go, and if you do go, you get up there and be like 'Look, I don't wanna go. I don't know. I don't. I don't wanna deal with this.' That's that. You have an opinion, bro. You acting like a bitch put a gun to your head." Government Exhibits at 62. That wasn't true. *See United States v. Fletcher*, 347 F. App'x 507, 513 (11th Cir. 2009) (holding that district courts may order witnesses to testify in criminal cases, subject to the witness's rights under the Fifth Amendment). Of course, there's nothing "inherently malign" about persuading CS to invoke her Fifth Amendment rights. *See Arthur Andersen, LLP v. United States*, 544 U.S. 696, 703–04 (2005). But that's not what Wilkins was doing. He was, to the contrary, advising her to ignore the Government's demands wholesale by, among other things, encouraging her to leave the state and change her phone number. *See* Trial Tr. at 689. When that didn't work, he threatened her into submission. *Id*. Viewing the statement in this context, then, a reasonable jury could have concluded that, far from trying to vindicate CS's constitutional rights, Wilkins was "misleading"— if not "corruptly persuading"—CS into eliding (for his sake, not hers) her legal obligations. To this point, CS's testimony was clear about whether—at least to her mind—Wilkins' advice was in any way aimed at helping *her*: "Q: And how did that advice work out for you? A: It got me in trouble." Trial Tr. at 682. The Court thus rejects Wilkins' baseless unwilling-witness theory.

*Second*, Wilkins says that he cannot be guilty of witness tampering because, while CS admitted to being scared, "it is equally plausible that she was really scared of the Government, because she was essentially forced to testify against Defendant—someone she admitted that she loved—but this coercion on the part of the Government happened only after the Government charged CS with federal crimes." Mot. at 10. In sum, Wilkins argues that he can't be guilty of

doing precisely what the Government had already done—of using coercive tactics to obtain a hoped-for result.

This argument is wrong for two reasons. One, "Section 1512(b) does not prohibit all persuasion, [] only that which is corrupt." *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (cleaned up). And Wilkins never claims that there's anything "corrupt" about the Government's decision to charge a defendant with a crime she admits to having committed. *See Davis*, 854 F.3d at 1291 ("Davis cites no authority suggesting that the government cannot use the threat of prosecution to encourage cooperation, and courts that have considered this issue have concluded otherwise."). And Wilkins cites no case or statute for the absurd proposition that the Government's (admittedly legitimate) charging decision somehow absolved him of his protracted and unabashed program of intimidation.

Two, if Wilkins is right—that "it is equally plausible that she was really scared of the Government, because she was essentially forced to testify against Defendant," *see* Mot. at 10— then his Motion would fail on its own terms. Recall that, in reviewing a Rule 29 motion, the Court must make all credibility choices—and draw all reasonable inferences—in favor of the jury's verdict. *See Williams*, 390 F.3d at 1324. And so, if (as Wilkins says) it's "equally plausible" that she was scared of *him*, the Court must draw *that* inference. Note, too, that CS repeatedly testified she *was* scared of Wilkins. *See* Trial Tr. at 642, 700, 705, 720, 722, 724, 726, 727, 737. This includes her testimony about having been forced to move to a different house—which, she said, was prompted by her fear of *the Defendant*. *See id*. at 698. Not once did she say that she was afraid of the Government. Again, in adjudicating Wilkins' Rule 29 Motion, this Court must accept this testimony as true. *Williams*, 390 F.3d at 1324.

*Third*, Wilkins insists that "the Government failed to prove that CS was actually telling the truth, so it is equally plausible that Defendant was persuading CS to tell the truth—only it was not the truth that the Government wanted her to say." *Id.* at 11. In other words, "it cannot be said that the testimony of CS was reliable enough to justify the convictions on either Counts 6 or 7." *Id.* This is silly. Under Rule 29, the Court must accept CS's testimony as true and draw all inferences in favor of the jury's verdict. *Williams*, 390 F.3d at 1324. That straightforward standard of review thus disposes of Wilkins' third argument here.

Wilkins' Rule 29 Motion, is for all these reasons, **DENIED**.

**B.    Rule 33**

Wilkins advances no separate argument under Rule 33. *See generally* Mot. The two salient distinctions between Rules 29 and 33 are: (1) Rule 33 allows the Court to weigh the evidence; and (2) the remedy under Rule 33 is a new trial (rather than an acquittal). *See Hernandez*, 433 F.3d at 1335. But Rule 33 motions should be granted *only* if, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred[.]" *Id.* And the Eleventh Circuit "more closely scrutinize[s] a court's grant of a new trial." *Id.* at 1336. "Motions for new trials based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really exceptional cases." *Id.* at 1336–37 (cleaned up).

This is not an exceptional case. As the Government points out, Wilkins' conviction—which was supported by voluminous objective evidence—could be sustained without *any* of CS's testimony. *See* Response at 11. So, for example, as the below email shows, Wilkins tried to "corruptly persuade" CS not to cooperate with the Government:

> [D]id you get all your legal work from talking to sara? . . . are you cooperating with the government now? I thought you were my lawyer investigator? Well I know you

> got the evidence of those visitation pictures why dont you answer the phone or email me back [CS]? Is that what I paid you for to be a snitch?

Government Exhibits at 99. When she persisted, as the next missive demonstrates, the emails took on a more threatening tone:

> So whats the status of your case? I got all the documents of you talking and im keeping track of everything. I also made sure everybody in the city got copies of you lying on that guy thats why u got caught up. Karmas a bitch why did you call the girl phone back yesterday and said you have the wrong number? Well since its going like dis I advise you to just leave the state because those guys know what u filed and told the agents since you are playing games & we have all the recording statements its on the internet right now so u can not run or hide.

*Id.* at 100. When that didn't work, as the next sequence indicates, he stripped his threats of all subtlety and nuance: "Lol you are moving, and thinking smart huh? Yea get outta florida why u can bruh. why are you scared when you see my people? They know whats up and got all the paperwork yea its best you leave bruh becuz shit hit the fan and ah nigga like me ready to do a life sentence bout my respect." *Id.* at 105. Enraged by her silence, he followed that gem up with the following explicit threat: "U Know whats up Lil nigga Im comin" *Id.* at 106. Growing more desperate, he then admonished CS that, if she didn't "act right"—i.e., stop cooperating with the Government—he would come after her with "dis wilding shit" (attack her in a crazy or wild way). Trial Tr. at 720. And, as we've seen, this was just the tip of the iceberg. In short, because there was more than enough objective evidence to sustain Wilkins' conviction, CS's credibility was mostly (if not wholly) irrelevant to the outcome.

Wilkins, for his part, has pointed to *no* objective evidence for his ludicrous reading of these messages—that they constitute nothing more than the innocuous and (in his view) helpful counsel of an ex-boyfriend. The evidence thus doesn't "preponderate[]," *see Hernandez*, 433 F.3d at 1335—let alone "heavily" so—against the jury's verdict.

27

In closing, the Court adds only this: Having sat through five days of trial, having listened to CS's testimony, having reviewed Wilkins' communications, the Court has no doubt that Wilkins was at all times involved in a concerted and purposeful effort to threaten, intimidate, and corruptly persuade CS out of testifying; that CS was telling the truth when she attested that Wilkins' conduct frightened her; and that any "reasonable recipient" of Wilkins' messages would have felt the same. Because the evidence strongly supports the jury's verdict, in other words, Wilkins' Rule 33 Motion is likewise **DENIED**.

***

For all these reasons, therefore, the Court hereby **ORDERS and ADJUDGES** that the Defendant's Motion for a Judgment of Acquittal and in the alternative for a New Trial [ECF No. 179] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 9th day of December 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record