**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NOS. 23-80033-CIV-ALTMAN**
**19-80032-CR-ALTMAN**

**CHRISTOPHER TAVORRIS WILKINS**,

    *Movant*,

*v.*

**UNITED STATES OF AMERICA**,

    *Respondent.*

_____/

**<u>ORDER</u>**

A federal jury in our District found the Movant, Christopher Tavorris Wilkins, guilty of possessing a firearm and ammunition after having been convicted of a felony and of tampering with a cooperating witness. *See* Amended Judgment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Mar. 23, 2021), ECF No. 249 at 1–2. For these crimes, we sentenced Wilkins to 210 months in federal prison. *Ibid.* Wilkins has now filed a motion to vacate under 28 U.S.C. § 2255, challenging his conviction and sentence. *See* Motion to Vacate ("Motion") [ECF No. 1]. After careful review, we **DENY** the Motion.

**THE FACTS**

On March 14, 2019, a grand jury in the Southern District of Florida charged Wilkins with committing five separate crimes: two counts of felon in possession of ammunition (Counts 1 and 2); one count of felon in possession of a firearm (Count 3); one count of conspiracy to distribute cocaine (Count 4); and one count of possession of a firearm in furtherance of a drug trafficking crime (Count 5). *See* Indictment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Mar. 14, 2019), ECF No. 1 at 1–3. A few months later, on August 29, 2019, the grand jury returned a Superseding

Indictment that charged Wilkins with two additional counts of tampering with a witness, victim, or informant (Counts 6 and 7). *See* Superseding Indictment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Aug. 29, 2019), ECF No. 57 at 4–5. In these two new counts, the Government alleged that Wilkins had attempted to "intimidate, threaten, [or] corruptly persuade" a witness—Wilkins's former girlfriend, C.S.—in a concerted effort to prevent her from testifying before the grand jury (Count 6) and from cooperating with law enforcement (Count 7). *Ibid.*

Wilkins took his case to trial, where (over the course of five days) the jury heard from C.S.—among many other witnesses. After one day of deliberations, the jury acquitted Wilkins of Counts 2, 4, and 5 of the Superseding Indictment, but found him guilty of Counts 1, 3, 6, and 7. *See* Verdict, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Nov. 8, 2019), ECF No. 125 at 1–4.[1] On April 30, 2020, Wilkins filed a "Rule 29 Motion for Acquittal and Rule 33 Motion for New Trial as to Counts 6 and 7," arguing that C.S.'s testimony was insufficient to prove that he had engaged in witness tampering. *See* Motion for Judgment of Acquittal, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Apr. 30, 2020), ECF No. 179 at 11 ("In this case, the Government failed to prove that CS was actually telling the truth, so it is equally plausible that Defendant was persuading CS to tell the truth—only it was not the 'truth' that the Government wanted her to say."). Rejecting this argument as "ludicrous," we found that Wilkins's text messages to C.S. were so "self-evidently

---

[1] Just before the jury was excused, Wilkins threw a chair at one of the prosecutors and began shouting that he would "[k]ill your fuckass. I'll kill you when I catch you, boy[.] . . . When I beat this shit, I'm gonna kill you. That's facts." Nov. 7, 2019 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 165 at 19–20. As a result of this post-trial outburst, a separate grand jury charged Wilkins with assaulting an Assistant U.S. Attorney and with threatening to assault and murder an Assistant U.S. Attorney. *See* Indictment, *United States v. Wilkins*, No. 21-60037-CR-CANNON (S.D. Fla. Jan. 29, 2021), ECF No. 1. Wilkins went to trial in that case, too, and the jury there likewise found him guilty of both crimes, after which U.S. District Judge Aileen M. Cannon sentenced him to 80 months in federal prison—consecutive to the sentence in our case. *See* Judgment, *United States v. Wilkins*, No. 21-60037-CR-CANNON (S.D. Fla. Apr. 4, 2022), ECF No. 93 at 1–2, *appeal docketed*, No. 22-11115 (11th Cir. Apr. 7, 2022).

menacing" that "CS's credibility was mostly (if not wholly) irrelevant to the outcome." *United States v. Wilkins* (*Wilkins I*), 2020 WL 7294525, at *9, *14 (S.D. Fla. Dec. 10, 2020) (Altman, J.).

Before sentencing, the Government filed a "Motion for the Court to Impose an Upward Departure or Upward Variance." Motion for Upward Departure, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. July 6, 2020), ECF No. 197. In support of that motion, the Government advanced three arguments: (1) that Wilkins had "tragically lived a life of unabated serious criminal activity from the age of 9," *id.* at 4; (2) that, during the course of this prosecution, Wilkins had "engaged in a continuous and egregious pattern of attempting to obstruct justice, including overt threats of death to the government's witnesses," *id.* at 10; and (3) that Wilkins's "future prognosis" as a productive member of society was grim given his lack of education, his inability to hold "gainful, lawful employment since 2012," and his propensity "to engage in violent criminal conduct," *id.* at 10–11. We granted the Government's Motion for an Upward Departure at Wilkins's sentencing and "increase[d] the total offense level from 27 to 29." Sentencing Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 22, 2021), ECF No. 245 at 81. We then sentenced Wilkins to 210 months in federal prison. *See* Amended Judgment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Mar. 23, 2021), ECF No. 249 at 1–2.[2]

Wilkins appealed his conviction and sentence to the Eleventh Circuit on December 26, 2020. *See* Notice of Appeal, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Dec. 26, 2020), ECF No. 238. In that direct appeal, Wilkins argued that we had erred "by denying his motion for judgment of acquittal based on insufficient evidence," and that we had improperly "enhanc[ed] his offense level under four Sentencing Guidelines provisions . . . and abused [our] discretion by imposing

---

[2] We amended Wilkins's judgment several months after the sentencing in order to add a condition of supervised release. *See* Paperless Order Granting Motion to Amend Judgment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Mar. 22, 2021), ECF No. 248 ("For the reasons stated on the record in open court on December 17, 2020, . . . the Judgment will be amended to include the requested term of supervised release."). But his prison term remained the same.

an unreasonable sentence." *United States v. Wilkins* (*Wilkins II*), 2022 WL 98748, at *1 (11th Cir. Jan. 10, 2022). The Eleventh Circuit rejected these contentions and affirmed Wilkins's conviction and sentence in full. *See id.* at *8 ("In sum, we affirm Wilkins's convictions for witness tampering under § 1512(b) because they are supported by sufficient evidence. We affirm Wilkins's 210-month sentence because the district court did not err in calculating the guideline range or even assuming it did, any error was harmless and the sentence is substantively reasonable."). Wilkins filed this § 2255 Motion on January 5, 2023.[3] *See* Motion at 18.

## THE LAW

### A.   Motions to Vacate Under 28 U.S.C. § 2255

Because collateral review isn't a substitute for a direct appeal, a movant can proceed under § 2255 only in extremely limited circumstances. As relevant here, a prisoner is entitled to relief under § 2255 if (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," (3) "the sentence was in excess of the maximum authorized by law," or (4) the sentence is "otherwise subject to collateral attack." § 2255(a); *accord McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). In other words, "relief under § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988) (cleaned up); *see also United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge will not do service for an appeal."). If a court grants a § 2255 claim, the court "shall vacate and set aside the judgment and shall discharge the prisoner or resentence him or

---

[3] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

grant a new trial or correct the sentence as may appear appropriate." § 2255(b). The movant bears the burden of proving his § 2255 claim. *See Beeman v. United States*, 871 F.3d 1215, 1222 (11th Cir. 2017) ("We rest our conclusion that a § 2255 movant must prove his [claim] on a long line of authority holding that a § 2255 movant bears the burden to prove the claims in his § 2255 motion." (cleaned up)), *cert. denied*, 139 S. Ct. 1168 (2019).

**B.      Ineffective Assistance of Counsel**

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). This same standard applies to alleged errors made by both trial and appellate counsel. *See Farina v. Sec'y, Fla. Dep't of Corr.*, 536 F. App'x 966, 979 (11th Cir. 2013) ("A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.").

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial," counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. If the defendant pleads guilty, the prejudice prong is modified so that the defendant must instead show "that there is a reasonable probability, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

## ANALYSIS

In his Motion, Wilkins asserts eight claims. In Ground One, he urges us to dismiss Counts 6 and 7 of the Superseding Indictment because "the Middle District of Florida would be [the] proper venue for tampering with [a] witness[.]" Memorandum of Law ("Memo") [ECF No. 1-1] at 8. In Ground Two, he complains that we should've held a *Remmer*[4] hearing during the trial because a "third party private communication by [the] courtroom security officer with Juror #10 prejudiced" him. *Id.* at 12. In Ground Three, he claims that the *Allen*[5] charge we gave the jury was "sufficiently coersive [sic] to deprive [Wilkins] of a fundamental[ly] fair trial." *Id.* at 27. In Ground Four, he contends that the Government defrauded the Court by "coaching [C.S.] and Sheldon Armstrong to manufacture, fabricate[ ] and [give] false testimony's . . . in exchange for their cooperation as informants for dismissal of multiple serious felony charges." *Id.* at 42 (errors in original). In Ground Five, he calls his trial lawyer ineffective for "fail[ing] to move for a mistrial and/or object to the Court's multiple instructions

---

[4] *See Remmer v. United States*, 347 U.S. 227 (1954).
[5] *See Allen v. United States*, 164 U.S. 492 (1896).

to the jury after the jury indicated that they were deadlocked[.]" *Id.* at 65. In Ground Six, he blames his lawyer for not demanding a *Remmer* hearing after there was a "communication between [the] courtroom security officer and Juror #10[.]" *Id.* at 79. In Ground Seven, he castigates his lawyer for "failure to raise [a] multiplicity punishment [argument] on Counts 1, 3, 6, 7." *Id.* at 87. And, in Ground Eight, he argues that his lawyer was ineffective for failing to "raise mental health suicide attempts of Government key witness [C.S.]." *Id.* at 95.

In its Response, the Government maintains that "[Grounds] 1 through 4 are procedurally barred as Movant did not raise them on appeal, and he has failed to show cause and prejudice or actual innocence." Response to Motion ("Response") [ECF No. 9] at 2. And the Government asks us to deny each of Wilkins's ineffective-assistance claims (Grounds Five through Eight) on the merits because "none of these claims raises a question of ineffective assistance of counsel." *Ibid.*[6]

## I.    Grounds One and Four

We'll begin by addressing the Government's claim that Grounds One and Four have been procedurally defaulted.[7] *See* Response at 2 ("Claims 1 through 4 are procedurally barred as Movant did not raise them on appeal[.]").[8] "Under the procedural default rule, a defendant generally must advance

---

[6] Since the Government didn't object to the Motion's timeliness, *see generally* Response, we'll assume that it's implicitly waived any time-bar defenses it could've raised under 28 U.S.C. § 2255(f), *see Day v. McDonough*, 547 U.S. 198, 202 (2006) ("[A] statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto."); *Griffin v. United States*, 847 F. App'x 752, 756 (11th Cir. 2021) ("And § 2255's statute of limitations is not a jurisdictional bar, so it can be waived or forfeited. In general, a statutory time limitation defense is forfeited if it is not raised in the defendant's answer." (cleaned up)).

[7] The Government wrongly refers to these claims as "procedurally barred" throughout its Response. As the Eleventh Circuit recently explained, though, "[t]he terms 'procedurally barred' and 'procedurally defaulted' have distinct meanings. A procedural bar prevents a defendant from raising arguments in a § 2255 proceeding that he raised and we rejected on direct appeal. . . . By contrast, a 'procedural default' occurs when . . . a defendant fails to raise an issue on direct appeal[.]" *Seabrooks v. United States*, 32 F.4th 1375, 1383–84 (11th Cir. 2022). And, since the Government is arguing that Grounds One through Four were "not raise[d] [on] direct appeal," what they're really saying is that these claims have been procedurally *defaulted*.

[8] We'll hold off on addressing Grounds Two and Three until later because they rely on the same facts and legal arguments as Grounds Five and Six. Indeed, Grounds Five and Six simply repackage

an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004). To overcome a procedural default, a § 2255 movant must show either (1) "cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error" or (2) "that it is more likely than not that no reasonable juror would have found [the movant] guilty beyond a reasonable doubt in light of [new] evidence of innocence." *McKay*, 657 F.3d at 1196 (cleaned up). Wilkins concedes that he didn't raise Grounds One and Four on direct appeal. *See* Motion at 4. As a result, these two claims are procedurally defaulted unless Wilkins can show *either* "cause and prejudice" *or* "actual innocence." *McKay*, 365 F.3d at 1196 ("The exceptions [to procedural default] are: (1) for cause and prejudice, or (2) for a miscarriage of justice, or actual innocence."). We agree with the Government that Grounds One and Four have been procedurally defaulted and that, in any event, these claims are meritless.

### A. The Procedural-Default Exceptions

We'll start with the easier of the two exceptions—actual innocence. As the Government rightly notes, Wilkins "does not demonstrate that he is actually innocent of the counts of conviction to overcome the procedural default." Response at 24. The "actual innocence" exception is "exceedingly narrow in scope" and requires the movant to show that, thanks to "new, reliable evidence," it's now "'more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting *Schlup v. Delo*, 513 U.S. 298, 327

---

Grounds Two and Three as ineffective-assistance claims. Since a lawyer cannot be ineffective for failing to make a meritless argument—and because a criminal defendant cannot be prejudiced by an error that had no effect on his trial—Grounds Five and Six can be denied if Grounds Two and Three are meritless. *See Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) ("Failing to make a meritless objection does not constitute deficient performance."); *Smith v. Dixon*, 14 F.3d 956, 976 (4th Cir. 1994) (en banc) ("It would be illogical to hold, on the one hand, that we are able to assess the effect of the error for purposes of deciding prejudice under *Strickland* . . . but find that we are unable to evaluate the effect of this error in determining prejudice for purposes of harmless error analysis [for trial court errors].").

(1995)). This "new evidence" must prove that the movant is *factually* innocent of the crime; evidence that calls into question the *legal sufficiency* of the conviction isn't enough. *See Bousley v. United States*, 523 U.S. 614, 623 (1998) ("It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency."); *see also, e.g., Justo v. Culliver*, 317 F. App'x 878, 880 (11th Cir. 2008) ("Justo rests his actual innocence claim exclusively on the [newly-discovered] indictment deficiency. . . . [The indictment] raises no reasonable doubt about Justo's commission of the theft offense to which he pleaded guilty."). Although Wilkins certainly challenges the *legal* sufficiency of his conviction, he never alleges that he's *factually* innocent of the charged offenses and, instead, relies only on the "cause and prejudice" exception. *See* Response Brief in Opposition of Government's Reply ("Reply") [ECF No. 17] at 3 ("The Government's own argument to have Petitioner Wilkins claims barred for procedural default supports cause and prejudice[.]" (errors in original)). Wilkins's actual-innocence claim thus "fails at the first step because he's identified no evidence (let alone 'new, reliable evidence' that 'was not presented at trial') to support his conclusory claims of innocence." *Castillo v. Dixon*, 2022 WL 2651623, at *5 (S.D. Fla. July 8, 2022) (Altman, J.) (quoting *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006)).

Nor (we should add) *could* he present any evidence of factual innocence. As we detailed at length in our Order denying Wilkins's Motion for Judgment of Acquittal, the jury was presented with overwhelming evidence of Wilkins's guilt—including the credible testimony of two former girlfriends, the sometimes-entertaining (and extremely inculpatory) account of a quondam friend and drug-trafficking conspirator, a collection of Wilkins's threatening communications to his girlfriend, and a healthy smattering of photographs (and videos) of Wilkins with guns and drugs. *See Wilkins I*, 2020 WL 7294525, at *1 ("At trial, both CS and GH testified against Wilkins—as did two Government experts (one on firearms, the other on videography) and the convicted felon who first introduced Wilkins to the drug trade. Along the way, the Government introduced dozens of exhibits, including

guns, bullets, pictures, videos, jail recordings, threatening e-mails, and menacing text messages—all driving towards one ineluctable conclusion: Wilkins' guilt."). Given all this, we're satisfied that the "actual innocence" exception doesn't save Wilkins here.

The "cause and prejudice" exception likewise doesn't apply. As its name suggests, this exception requires Wilkins to show *both* "cause" for failing to raise his procedurally defaulted claims on direct appeal *and* "prejudice." *See Gordon v. Nagle*, 2 F.3d 385, 388 n.4 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice[.]"). "[T]o show cause for procedural default, [Wilkins] must show that some objective factor external to the defendant prevented [Wilkins] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [Wilkins's] own conduct." *Lynn*, 365 F.3d at 1235. To establish prejudice, Wilkins must prove that the alleged errors "worked [to his] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Fordham v. United States*, 706 F.3d 1345, 1350 (11th Cir. 2013) (quoting *Ward v. Hall*, 592 F.3d 1144, 1179 (11th Cir. 2010)). Needless to say, this is an extremely high burden, and Wilkins has come nowhere close to meeting it.

Wilkins tries to show "cause" by blaming his *appellate* lawyer for failing to raise the defaulted claims on appeal. *See* Reply at 2 ("Petitioner's claims all fall under the exception of cause and prejudice and ineffective assistance of counsel to excuse the alleged procedural default.").[9] Although "[i]neffective assistance of counsel may satisfy the cause exception to a procedural bar," Wilkins must

---

[9] Wilkins also alleges, in the alternative, that "no trial transcripts [were] available at the time" of his direct appeal. Motion at 4. But Wilkins's trial transcript was docketed on February 24, 2020—almost a *full year before* Wilkins filed his Notice of Appeal on December 26, 2020. *See* Notice of Appeal, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Dec. 26, 2020), ECF No. 238. In any event, even if the trial transcripts hadn't been filed, Wilkins has failed to show that their absence excused his procedural default. *See McCoy v. Newsome*, 953 F.2d 1252, 1260 (11th Cir. 1992) ("McCoy alleged that he 'would not have had the trial transcript' to aid him in his preparatory efforts because his direct appeal was still in progress. However, he has not alleged or made any showing that the state denied a request for the transcript or that there were not available to him alternative devices that would have fulfilled the same functions as the transcript.").

still prove that his "claim of ineffective assistance [has] merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000). Plus, as we've said, Wilkins must show that counsel's errors were so substantive (and prejudicial) that they "infected" his "entire trial[.]" *Fordham*, 706 F.3d at 1350. Wilkins falters at both of these steps. Since Grounds One and Four are totally meritless, Wilkins cannot show that his appellate lawyer was ineffective for failing to raise them on direct appeal—much less that these (alleged) "errors" created an "actual and substantial disadvantage" at trial. We'll take them one at a time.

**B.    Ground One**

In Ground One, Wilkins says that Counts 6 and 7 of the Superseding Indictment—which charged him with two different kinds of witness tampering—should've been brought in the Middle District of Florida because that's where he was when he threatened C.S. *See* Memo at 6 ("Both Count 6 and Count 7 were committed in [the U.S. Penitentiary Coleman II] where [Wilkins] was housed as an inmate. Both counts were committed . . . [in] the Middle District of Florida and not the Southern District of Florida."). We already heard (and rejected) this venue argument once before. Shortly after trial (but before sentencing), Wilkins filed a *pro se* "Motion to Withdrawal [sic] Counsel," in which he complained that his trial counsel had failed to "file [a] motion in regards to improper venue as to Count 6 and Count 7" since Wilkins "was not in Palm Beach County" when the threats were made. *See* Motion to Withdraw Counsel, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Nov. 15, 2019), ECF No. 134 at 2. We rejected this argument as frivolous. *See* Sealed Motion to Withdraw Hr'g Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Mar. 13, 2020), ECF No. 174 at 23 ("The idea that he wasn't—there's an improper venue, because [Wilkins] wasn't in Palm Beach . . . ha[s] no good-faith basis. And so, no lawyer, who's an officer of the Court, is required to [file a motion] just because their client believes that [it] should be filed.").

And we were right to say so. As Wilkins correctly notes, "[t]he Constitution, the Sixth Amendment, and Rule 18 of the Federal Rules of Criminal Procedure guarantee defendants the right to be tried in the district in which the crime was committed." *United States v. Breitweiser*, 357 F.3d 1249, 1253 (11th Cir. 2004); *see also United States v. Cores*, 356 U.S. 405, 407 (1958) ("The Constitution makes it clear that determination of proper venue in a criminal case requires determination of where the crime was committed." (first citing U.S. CONST. art. III, § 2, cl. 3; and then citing U.S. CONST. amend. VI)). But the witness-tampering statute is clear that venue is proper "in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected *or* in the district in which the conduct constituting the alleged offense occurred." 18 U.S.C. § 1512(i) (emphasis added); *see also, e.g.*, *United States v. Gonzalez*, 922 F.2d 1044, 1054–55 (2d Cir. 1991) (explaining that § 1512(i) was enacted "so that 'if a witness scheduled to testify in a District of Columbia trial is killed while dining at a restaurant in Maryland, the prosecution for obstruction of justice could take place *in either* Maryland or in the District of Columbia'" (emphasis added) (quoting 134 CONG. REC. S7446-01 (June 8, 1988) (statement of Sen. Edward Kennedy))). And that, by the way, is generally true of other offenses too. *Cf. United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) ("[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." (quoting *United States v. Lombardo*, 241 U.S. 73, 77 (1916))).

This background easily disposes of Ground One. The Superseding Indictment in our case specifically alleged that Wilkins was trying *both* to prevent C.S. from testifying before the grand jury *and* to stop her from cooperating with agents *in the Southern District of Florida*. *See* Superseding Indictment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Aug. 29, 2019), ECF No. 57 at 4–5. Because Wilkins was thus tampering with an ongoing federal investigation in the Southern District of Florida, the Government brought Counts 6 and 7 in the right district. *See, e.g.*, *United States v. Fakih*, 264 F. App'x 78, 80 (2d Cir. 2008) ("Fakih's assertion that venue was improper in the

Southern District of New York because the alleged witness tampering occurred in Brooklyn [in the Eastern District of New York] lacks merit. . . . Fakih met with Rothenberg and asked him to conceal certain information from the FBI. That evidence is sufficient to demonstrate that Fakih was trying to tamper with the grand jury investigation run out of the Southern District of New York—all that is required by 18 U.S.C. § 1512(i)."); *United States v. Salman*, 2017 WL 3034041, at *5 (M.D. Fla. July 18, 2017) (Byron, J.) ("The facts presently before the Court, albeit limited, support a finding that the offense began in the Southern District of Florida and was intended to adversely impact FBI agents and federal judges located in the Middle District of Florida. That is, the offense was continuing in nature, making venue proper in [the Middle District of Florida].").

In response to this unambiguous statutory authority, Wilkins cites a recent decision from the Eleventh Circuit, *United States v. Smith*, 22 F.4th 1236 (11th Cir. 2022), *aff'd*, 143 S. Ct. 1594 (2023), for his view that venue is governed by the location of the defendant—*not* the victim, *see* Memo at 6 ("In *Smith* [the defendant] argued that the Southern District of Alabama was the proper venue where he lived and took trade secrets by computer from Strikelines computer server . . . and [the Northern District of Florida] was improper place of venue, because he never committed any essential conduct in that location." (errors in original)). But, unlike the defendant in *Smith*, Wilkins wasn't charged with stealing trade secrets under 18 U.S.C. § 1832(a). And venue (as we've suggested) "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998) (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)). As the *Smith* Court explained, the theft of trade secrets is different from other federal crimes (such as obstruction of justice or witness tampering) because the theft statute "does not define any essential conduct element of the offense in terms of its effects on the owner of the trade secret. . . . A plain reading of the statute reveals that there is no requirement that the owner of the trade secret realize a loss." 22 F.4th at 1244 (cleaned up). The upshot is that the trade-secret offense is fully consummated

when the defendant steals the secret—*wherever* the defendant happens to be—irrespective of any harm the theft may have caused the victim. And, since the victim is irrelevant to the offense, the victim's *location* at the time of the offense is likewise inapposite.

Wilkins says that "the essential conduct elements of witness tampering [solely] took place at Coleman-2 Penitentiary in the Middle District of Florida," Memo at 11, but that's just not true. As we've explained, § 1512(i)—unlike the trade-secret statute at issue in *Smith*—explicitly provides that "the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected" (in our case, the Southern District of Florida) is the proper venue in a witness-tampering case. 18 U.S.C. § 1512(i). And Congress was well within its discretion to authorize venue in multiple districts. *See Smith*, 22 F.4th at 1244 (noting that "Congress may, consistent with the Constitution, define the essential conduct elements of a criminal offense in terms of their effects, thus providing venue where those effects are felt."); *United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000) ("While the venue rule—trial in the district where the crime is committed—seems straightforward, the place of the crime can be difficult to determine. Of course, Congress can prevent some of that difficulty *by including an express venue provision in a criminal statute*." (emphasis added) (citing 18 U.S.C. § 1512(i)); *United States v. Baugh*, 597 F. Supp. 3d 502, 510 (D. Mass. 2022) (Saris, J.) ("I conclude that venue is proper under § 1512(i) in Massachusetts because the misleading conduct was targeted at impeding the investigation by law enforcement officers of the federal offense in Massachusetts, even if the actual misleading conduct occurred in California.").[10] Our District, in sum, was a proper venue

---

[10] Even before § 1512(i) was enacted, federal courts had uniformly concluded that the "essential conduct" of witness tampering takes place in the district where the prosecution is pending. *See United States v. Johnson*, 713 F.2d 654, 659 (11th Cir. 1983) ("Thus, in a [witness-tampering] prosecution 'venue is to be determined by focusing on which court is affected by the attempt to influence, obstruct, or impede the due administration of justice. It is the impact of the acts, not their location, that controls.'" (quoting *United States v. Barham*, 666 F.2d 521, 524 (11th Cir. 1982) (cleaned up))); *United States v. Frederick*, 835 F.2d 1211, 1214 (7th Cir. 1987) ("We view the [witness tampering] in the present case not just as an assault upon an individual victim but as an assault upon the grand jury sitting in the Northern District of Illinois and upon the judicial process.").

for Counts 6 and 7, which charged Wilkins with threatening C.S., an essential witness for the prosecution in this District.

## C.     Ground Four

In Ground Four, Wilkins claims that the prosecutor and the case agent "deliberately planned and carefully orchestrated and executed an unconscionable scheme to defraud the court . . . by knowingly with reckless disregard for the truth and integrity of the judicial machinery procured false and fabricated testimony's as evidence[.]" Memo at 42 (errors in original). Here, Wilkins accuses the Government of suborning perjury from two witnesses (C.S. and Sheldon Armstrong)—before *both* the grand and petit juries. *See id.* at 61 ("[C.S.] and Sheldon Armstrong both were coerced . . . to fabricate testimonies to the grand jury, district court, and petit jury in exchange for dismissal of the charges, orchestrated by U.S. Attorney John McMillan and ATF agent Sara Connors."). The Government unsurprisingly disagrees. *See* Response at 34 ("Here, Movant does not provide any evidence of prosecutorial misconduct. Instead, Movant mischaracterizes and twists the testimony of CS and Armstrong at trial to suggest fraudulent conduct that did not take place[.]"). Ground Four is meritless.

For starters, in both his Motion and his Reply, Wilkins grounds his "fraud upon the court" claim in the provisions of Rule 60(d)(3) of the Rules of *Civil* Procedure.[11] *See* Memo at 40 ("Fraud on the court has been narrowly interpreted as contemplated by Rule 60(d)(3)."); Reply at 10 ("[Rule 60(d)(3)] does not limit a court's power to set aside a judgment for fraud on the court."). And (it's

---

[11] "Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (quoting *United States v. Int'l Tel. & Tel. Corp.*, 349 F. Supp. 22, 29 (D. Conn. 1972), *aff'd*, 410 U.S. 919 (1973)); *see also Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944) ("From the beginning there has existed along side [sic] the term rule a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry.").

true) Rule 60(d)(3) *does* authorize a court, at any time, "to set aside a judgment for fraud on the court." FED. R. CIV. P. 60(d)(3). But Rule 60(d)(3) only applies to *civil* cases and cannot be used to attack the validity of a criminal conviction. *See United States v. Mosavi*, 138 F.3d 1365, 1366 (11th Cir. 1998) ("Rule 60(b) simply does not provide for relief from judgment in a criminal case[.]"); *Price v. United States*, 2010 WL 5343199, at *3 (M.D. Ala. Nov. 5, 2010) (Coody, Mag. J.) ("Rule 60, like all Federal Rules of Civil Procedure, apply only to civil actions and proceedings in the United States District Court. Thus, it is well settled that FED. R. CIV. P. 60 does not provide a vehicle for relief from a judgment in a criminal case." (cleaned up)), *report and recommendation adopted*, 2010 WL 5388048 (M.D. Ala. Dec. 21, 2010) (Fuller, C.J.). Normally, that would be the end of Ground Four. But, since Wilkins is proceeding *pro se*, we'll give him the benefit of a second look and reconstrue Ground Four as asserting a claim of prosecutorial misconduct—which, unlike Rule 60(d)(3), *is* a basis for collaterally attacking a criminal conviction.

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that a prosecutor engages in misconduct when he deliberately relies on falsified evidence at trial. *See id.* at 153 ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935))). To establish a viable *Giglio* claim, Wilkins must show that "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material—*i.e.*, that there is 'any reasonable likelihood' that the false testimony 'could have affected the judgment.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quoting *Giglio*, 405 U.S. at 154). In other words, Wilkins must show that C.S. and Armstrong lied, that the Government *knew* they were lying, and that the witnesses' lies were *material* to the jury's verdict. Wilkins insists that the Government participated in a conspiracy to convict him with false evidence. *See* Memo at 42 ("These two officers of the court deliberately planned and carefully orchestrated and executed an unconscionable scheme to defraud

16

the court . . . . [The Government] procure[d] false and fabricated jury instructions based upon [C.S.'s] and Sheldon Armstrong's fabricated testimonies along with defrauding the petit jury and obtaining an unjust 17 1/2 year sentence by fraud upon the court."). But he fails to show *either* that the witnesses lied *or* that, if they did lie, those lies had any effect on the outcome of his trial.

### 1. Sheldon Armstrong

We'll start with Sheldon Armstrong. The Government called Armstrong to testify about Wilkins's involvement in a conspiracy to distribute crack cocaine and to establish that Wilkins carried a firearm—specifically, a 9mm Russian Makarov—in furtherance of that conspiracy (*i.e.*, the crimes charged in Counts 4 and 5 of the Superseding Indictment). *See, e.g.*, 11/5/2019 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 162 at 153 ("[The Prosecutor]: Okay. Now, in this case, which type of crack cocaine did you make for Mr. Wilkins? [Armstrong]: Freebase Q: Okay. And, uhm, how much did you make for him? A: It's about—about ten, nine grams."); *id.* at 161 ("Q: Now, in addition to the crack cocaine, did there come a time when the defendant asked for yet another present of some sort from you? A: Yeah. Q: What did he ask for? A: A gun."); *id.* at 163 ("Q: Okay. And do you remember whether [the gun] had any markings on it? . . . A: I remember seeing 9, 'Russia 9.'").

Armstrong's credibility was a major issue at trial. In fact, defense counsel's impeachment of Armstrong was so extensive that we brought the lawyers sidebar to share the following observation:

> The Court: I think we've established that this guy lies, he lies a lot, and he only cares about himself. How much longer—are we going to go through every statement he ever made? We're going to be here until 2025.

> [Defense Counsel:] Let me look at my notes, Judge, see if I can speed it up a little bit.

> The Court: I mean you've established—I think the jurors are ready to move on, from what I can tell.

*Id.* at 217–18. In saying so, however, we were referring to defense counsel's effective impeachment of Armstrong about lies he had told *in the past*—impeachment that mostly involved showing him his prior

inconsistent statements and grilling him about his motives for cooperating with the Government. What we never suggested was that Armstrong was lying *at trial* about Wilkins's involvement with guns and drugs—much less that the Government *knew* he was lying. Nor, indeed, would we have said that Armstrong was lying about any of that because his testimony about Wilkins as a gun-carrying drug dealer was corroborated *both* by C.S. *and* by the pictures and videos the Government introduced at trial—pictures and videos of Wilkins with guns and drugs. *See Wilkins II*, 2022 WL 98748, at *1 ("C.S. met with Special Agent Connors . . . and showed her photos and videos of Wilkins holding guns and ammunition."); *see also, e.g.*, 11/4/2019 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 161 at 77–83 (introducing and publishing pictures and videos of Wilkins possessing firearms).

In any event, "[i]n the *Giglio* context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005). For his view that Armstrong was lying, Wilkins tells us only that, by agreeing to "snitch," Armstrong must have agreed with the Government to "manufacture an event in order to get benefits." Memo at 54. But that's just speculation—not evidence. *See Nyhuis*, 211 F.3d at 1345 ("Nyhuis again supports his conspiracy theory by recounting portions of the testimony and citing exhibits and drawing the conclusion that such a conspiracy *must have* existed. These unsupported assertions do not entitle Nyhuis to habeas relief. [Prosecutorial misconduct] can be invoked only in the rarest and most outrageous circumstances, and must be supported by more than mere speculation and theory." (cleaned up)); *United States v. Crockett*, 534 F.2d 589, 603 (5th Cir. 1976) ("Appellant Crockett contends that the Government's failure to inform the defense of an 'important agreement it had with Helen Moore' violated the principles set forth in [*Giglio*]. . . . Crockett's counsel has no proof of any agreement only his own speculation."); *Serrano v. Sec'y, Dep't of Corr.*, 2018 WL 3621045, at *10 (M.D. Fla. July 30, 2018) (Honeywell, J.)

("Serrano's [*Giglio*] claim must fail because he has not alleged any facts to show that Detective Vance's testimony was false. Rather, his claim is based on speculation arising out of his belief that Detective Vance has a personal 'vendetta' against him. Further, even if her testimony was false, Serrano alleges no facts showing that the prosecutor knew the testimony to be false.").[12]

But here's the thing: Even if everything Armstrong said at trial was false—and even if the Government knew that it was false—Wilkins's claim would still fail because nothing Armstrong said led to his conviction. Remember, the Government called Armstrong to establish two things: (1) that Wilkins was selling crack cocaine, *see* 11/6/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 163 at 140 ("[The Prosecutor:] [A]nd you heard from Sheldon Armstrong that [the crack cocaine] was the same straight drop crack that he cooked[.]"); and (2) that Wilkins possessed a 9mm Russian Makarov, *see id.* at 138 ("Now, what happened to that gun? Who knows? It was never recovered. We don't know where it ended up, but we do know who gave it to the defendant, because you heard from him, from Sheldon Armstrong himself."); *see also id.* at 33 ([Defense Counsel:] [T]he first time you became aware of [the Makarov] was through Sheldon Armstrong, right? [Agent Connors]: He was the first person that could describe what it was, yes, sir."). But, despite Armstrong's testimony, the jury unanimously found Wilkins *not guilty* of conspiring to distribute crack cocaine and *not guilty* of possessing the 9mm Russian Makarov. *See* Verdict, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Nov. 8, 2019), ECF No. 125 at 2. The Government's use of Armstrong's supposedly "false testimony" thus *couldn't* have been "material" to Wilkins's conviction because the jury rejected Armstrong's testimony and acquitted Wilkins of all the

---

[12] We should add that having an *incentive* to lie and *actually* lying are not at all the same thing. When a wife asks her husband whether she looks beautiful in a particular dress, the husband (we can all agree) has a very powerful incentive to lie. If he tells her that she looks ugly or fat, he might end up sleeping in the bathroom. But that doesn't make every husband who says that his wife looks beautiful a liar. Many (perhaps most) husbands will fully believe that their wives look beautiful for reasons having nothing to do with incentives.

things Armstrong accused him of doing. *See United States v. Davis*, 718 F. App'x 946, 949 (11th Cir. 2018) ("Mr. Davis, however, was acquitted on the charge of possession with the intent to distribute. The improper use of the photograph (to suggest that Mr. Davis made lots of money by selling drugs) would seemingly only matter if the jury had convicted Mr. Davis of distribution. Because it did not, we cannot say that Mr. Davis's substantial rights were prejudiced at all."); *cf. United States v. Rodriguez*, 765 F.2d 1546, 1560 (11th Cir. 1985) ("Finally, we point out that any [prosecutorial] impropriety was isolated and certainly did not permeate the entire trial. Ramirez was acquitted on one of the counts. This alone is telling proof that he was not prejudiced by the prosecutor's remarks.").

### 2. C.S.

Wilkins's claim fares no better as to C.S. He insists (again) that we shouldn't believe C.S.'s testimony because the Government met with her seventy-six times and threatened to bring criminal charges against her. *See* Memo at 44 ("After two years of scaring her and threatening [C.S.] with prison, and she finally submitted to [the Government]. They began coaching her to make fabricated and false testimony's against Wilkins at the grand jury, requiring her to have a combined 76 prepping and coaching meetings." (errors in original)).[13] As with Armstrong, Wilkins offers no proof that C.S. lied at trial—and his conspiracy theories aren't enough to sustain his claim. *See Maharaj*, 432 F.3d at 1313 ("In the *Giglio* context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false."); *Nyhuis*, 211 F.3d at 1345 ("Nyhuis again supports his conspiracy theory by recounting portions of the testimony and citing

---

[13] The irony of this position isn't lost on us. It was, after all, *Wilkins* who repeatedly threatened to harm C.S. if she cooperated with the Government. *See Wilkins II*, 2022 WL 98748, at *5 ("Then, starting in July 2018, Wilkins escalated to intimidation tactics and threats of violence after learning that C.S. was cooperating with the government. Over several months and across different media, he called C.S. a 'snitch' and warned that she was being watched and 'cannot run or hide'; he said he was going to find her new address and was 'ready to do a life sentence bout my respect'; and he stated he was coming after her if she did not 'act right' and stop being 'against me.' C.S. interpreted these statements as threats to stop cooperating with the government or Wilkins would 'come after her' and harm her, and they made her feel scared.").

exhibits and drawing the conclusion that such a conspiracy *must have* existed. These unsupported assertions do not entitle Nyhuis to habeas relief.").

In any event, the Government did nothing wrong in its treatment of C.S. For one thing, the Government was fully justified in charging C.S. with a federal crime when it became clear that she had helped Wilkins—a convicted felon—illegally obtain ammunition. *See* Criminal Complaint, *United States v. C.S.*, No. 18-mj-8301 (S.D. Fla. June 25, 2018), ECF No. 1 at 1 (charging C.S. with "knowingly transferring ammunition to a convicted felon" and "aiding and abetting the possession of a firearm and ammunition by a convicted felon"); *see also Wilkins I*, 2020 WL 7294525, at *1 (recounting that, at trial, the Government showed video footage from a Walmart "where Wilkins calmly pointed out the bullets he wanted and then walked alongside [C.S.] as she paid for them at the counter"). The Eleventh Circuit, in fact, has already found (on Wilkins's direct appeal) that it wasn't "unfair to permit the government to use threats of prosecution to encourage the cooperation of a reluctant witness[.]" *Wilkins II*, 2022 WL 98748, at *5 n.2 (citing *United States v. Davis*, 854 F.3d 1276, 1291 (11th Cir. 2017)). And (it goes without saying) the Government was entitled to drop the charges against C.S. when she began cooperating against Wilkins. *See, e.g.*, *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States v. Harvey*, 869 F.2d 1439, 1444 (11th Cir. 1989) ("[A] prosecutor may, as in this case, informally grant transactional immunity to a witness in return for [her] cooperation in a criminal case.").

For another, there's nothing wrong with a prosecutor (and his case agent) meeting regularly with a cooperator. *See, e.g.*, *United States v. Montgomery*, 2022 WL 1062978, at *5 (M.D. Ga. Apr. 8, 2022) (Hyles, Mag. J.) ("As a preliminary matter, the Court finds nothing sinister in the fact that prosecutors and investigators met with some witnesses prior to their grand jury testimony. It is difficult to see how

an investigation of this magnitude could be efficiently conducted otherwise."). That's particularly true in a case like ours where the Defendant engages in a systematic and protracted effort to threaten, harass, and intimidate the witness *out* of cooperating. The Government, remember, was forced to "locate[ ] [C.S.] to a new residence" in response to Wilkins's frequent threats. *Wilkins II*, 2022 WL 98748, at *2; *see also* 11/5/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 162 at 15 ("[Defense Counsel]: Let me ask you, how many meetings have you had just with the agents[?] . . . [C.S.]: Like 70—it was a lot, because [Agent Connors] *moved me at the time*." (emphasis added)); *id.* at 100 ("[The Prosecutor]: And—but these meetings with Special Agent Connors, were there things that she needed to do to assist in relocating you? A: Yes."). C.S. also met with Agent Connors several times after Wilkins's sister (Pearl) "attempt[ed] to run CS off the road" and "attack[ed] [C.S.] in a convenience store" at Wilkins's direction. Response in Opposition to Defendant's Supplemental Motion to Exclude, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Oct. 11, 2019), ECF No. 87 at 7–8; *see also* 11/5/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 162 at 15–16 ("[The Prosecutor]: [A] great majority of those meetings between Special Agent Connors and [C.S.] were concerning the Pearl attacks."). There were, in short, plenty of legitimate reasons for C.S. to meet with the Government, and none of them have anything to do with "framing" Wilkins.

One more thing: Wilkins's attack on C.S. has *already* failed. The night before trial, Wilkins's defense counsel claimed that the Government had violated *Giglio* when it failed to timely disclose information that (defense counsel believed) revealed a conflict between C.S.'s trial and grand-jury testimony. *See* Motion to Continue Trial, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Oct. 29, 2019), ECF No. 114 at 3 ("[O]pposing counsel reviewed several portions of [C.S.'s] first grand jury testimony with her and then asked her if what she had said in her first grand jury testimony was true or not. On several occasions, she stated that it was a lie."). We rejected this argument because

C.S. had "never given an inconsistent story about Mr. Wilkins' involvement with Mr. Armstrong"; since her testimony "[is] not a lie," we said, "it's not *Giglio*." 10/30/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 159 at 20.

We reaffirmed this finding after trial. While C.S. "was an imperfect witness" who had lied *both* to the grand jury *and* to Agent Connors, we still believed her *trial* testimony because "the Government adduced overwhelming objective evidence—calls, text messages, emails, and (of course) the letter— of Wilkins' pervasive and unabashed course of witness tampering." *Wilkins I*, 2020 WL 7294525, at *8; *see also* Sentencing Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 22, 2021), ECF No. 245 at 25–26 ("[The Court:] C.S., to her credit, was strong enough to come in and testify against Mr. Wilkins. I watched her testimony. It was credible throughout. She admitted that she had lied before. She admitted all of her contrary motivations. I watched her, I believed her. More importantly, 12 jurors randomly selected from the community believed her[.]"). And, of course, the Eleventh Circuit agreed. *See Wilkins II*, 2022 WL 98748, at *5 ("The government presented ample evidence and testimony that Wilkins used corrupt persuasion, intimidation, and threats with the intent to prevent C.S. from testifying against him before a grand jury and from cooperating with ATF in the investigation against him."). Since C.S.'s testimony was corroborated by "objective evidence," we don't think she lied—and, as a result, the Government didn't commit a *Giglio* violation. *See Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1294 (11th Cir. 2012) (finding no *Giglio* violation where "numerous witnesses as well as physical evidence corroborated [the witness's] testimony"); *see also Wilkins I*, 2020 WL 7294525, at *14 ("In short, because there was more than enough objective evidence to sustain Wilkins' conviction, CS's credibility was mostly (if not wholly) irrelevant to the outcome.").

\* \* \*

Because Grounds One and Four are procedurally defaulted, Wilkins bore the burden of showing "cause and prejudice" for his failure to advance these claims on direct appeal. Since he's failed to do either, we **DISMISS** Grounds One and Four as procedurally defaulted.[14]

## II.    Grounds Two and Six

In Grounds Two and Six, Wilkins contends that one of the jurors had an improper conversation with our Court Security Officer ("CSO"). In Wilkins's view, this conversation must have prejudiced him in some way—though, of course, he never deigns to tell us how. *See* Memo at 12–13 ("Defendant argues it was reported from the Judge to the Defense that a mid-trial private communication between [the CSO] and Juror #10 had occurred on a 15 minute recess. That is forbidden. . . . It has been long held by the Supreme Court in [*Remmer*] that once a private communication between a third party and juror has been established, it is deemed prejudicial."); Reply at 30 (claiming that counsel should have requested a *Remmer* hearing "after it was discovered CSO [ ] approached to tamper with Juror Number 10 . . . and had a third party private communication with her."). The Government (rightly) responds that "there is no evidence whatsoever that the jury was subjected to influence by outside sources," and it accuses Wilkins of "tak[ing] great liberties with the record and creat[ing] a conspiracy theory that did not exist and is not supported anywhere in the record." Response at 21. As with so many of the *pro se* positions Wilkins has taken in this case, these two claims are utterly baseless.

In *Remmer*, the Supreme Court held that "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]" 347 U.S. at 229; *see also United States v. Moore*, 954 F.3d 1322, 1332 (11th Cir. 2020) ("A district court must conduct a *Remmer* hearing when there is evidence

---

[14] As our analysis has made plain, even if these claims weren't procedurally defaulted, we would have denied them on the merits.

of *outside* influence."). "To trigger the court's duty to investigate outside influences, [the defendant] must show 'clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety [had] occurred.'" *United States v. Pierre-Louis*, 860 F. App'x 625, 636 (11th Cir. 2021) (quoting *United States v. Benjamin*, 958 F.3d 1124, 1136 (11th Cir. 2020)). It follows, then, that a court needn't hold a *Remmer* hearing if the defendant has *no* evidence "that the jury was subjected to influence from outside sources." *United States v. Watchmaker*, 761 F.2d 1459, 1465 (11th Cir. 1985); *see also United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997) ("Instead, an allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict."); *Barnes v. Joyner*, 751 F.3d 229, 244 (4th Cir. 2014) ("Therefore, to be entitled to the *Remmer* presumption and a *Remmer* hearing, a defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." (cleaned up)).

Fortunately, we have a fairly clear record about the conversation that took place between the CSO and Juror #10. During a break in the trial—but before deliberations had begun—we received a note from Juror #10, asking the following questions: "[H]ow many of us have to agree on the same verdict (guilty or innocent) for the defendant to be declared guilty or innocent? What does it mean 'guilty' in this case? How many years of jail will be considered? Minimum-maximum? (And most likely number of years if the case is guilty)?" 11/4/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 161 at 60 (errors in original). Having received this note, we then explained (on the record) *how* the note had come into our possession:

> Well, this juror actually mentioned—spoke alone to Alan, my court security officer, outside the presence of other jurors. And Alan then instructed her: "I'm not allowed to talk to you about this, but put down whatever your question is in writing."
>
> So, my understanding, based on that interaction, is that this juror has done this on her own, based on the fact that she's written it—well, based on two facts. One, that she waited until she was alone with Alan to begin asking the question of Alan, and that

Alan instructed her to put her question down in writing, all outside the presence of the other jurors. That's one.

And, two, then she specifically, at the top of this note, which I didn't tell you in the first instance, she wrote 'Paula Thompson, participant number,' and then she writes her exact juror number, suggesting, again, very strongly, that this is coming only from her and not from any of the other jurors.

*Id.* at 61–62.

There was thus (contra Wilkins's position) no "unauthorized communication" from a third party to a juror. On the contrary, it was Juror #10 who approached the CSO—not the other way around—to ask a question (which the CSO rightly refused to answer). And thoughts that independently germinate in a juror's minds are not grounds for a *Remmer* hearing. *See Moore*, 954 F.3d at 1332 ("A district court must conduct a *Remmer* hearing when there is evidence of *outside* influence. Here, there was no such evidence. The district court inquired—and both jurors affirmed—that there were no outside influences propelling their concerns."); *United States v. Chiantese*, 582 F.2d 974, 979 (5th Cir. 1978)[15] ("We realize that in instances where the jury misconduct involves influences from outside sources, the failure of the trial judge to hold a hearing constitutes an abuse of discretion and is therefore reversible error. . . . But here there was no outside influence, and we consider this a point of distinction."); *Breal v. United States*, 2017 WL 11420853, at *4 (S.D. Fla. Jan. 19, 2017) (White, Mag. J.) (finding that counsel wasn't ineffective for failing to request a *Remmer* hearing after "a juror asked the court reporter whether they were allowed to discuss the case"), *report and recommendation adopted*, 2017 WL 11420846 (S.D. Fla. Feb. 28, 2017) (Moreno, J.).

But that's not the end of our story because, in an abundance of caution, and with the consent of both sides, we *did* briefly question Juror #10 about the note. Here's how that exchange went down:

The Court: I've received your two questions.

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Juror No. 10: Yes.

The Court: Before I answer the questions, let me instruct you again: It is very important that you not prejudge the case. You are not permitted to decide whether you think the defendant is guilty or not guilty until you've heard all of the evidence in the case.

Juror No. 10: Of course.

The Court: Okay. And you followed that instruction?

Juror No. 10: Definitely.

The Court: Okay. Now, again, my second very important instruction is: You are not—and the other jurors—*nobody is allowed to discuss with each other their findings about the case, as I've instructed you before.*

Juror No. 10: *Of course.*

The Court: Or anything about the case until you begin your deliberations at the end of the case.

Juror No. 10: Hum-hum.

The Court: *And you followed that instruction?*

Juror No. 10: *Definitely, yes.*

The Court: Okay. Great. So, with all of that said, I don't think that you should be discussing with them this note or my answers to the note, okay?

Juror No. 10: Um-hum.

The Court: And you haven't, correct?

Juror No. 10: No, definitely not. *It's just my concern.*

The Court: Great.

11/4/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 161 at 64–65 (emphases added). As the end of this exchange makes clear ("[i]t's just *my* concern."), Juror #10's concerns were hers and hers alone (*i.e.*, they didn't come from any "outside sources"), and she didn't share them with any other members of the jury. That's pretty much the end of these two

claims. *See Watchmaker*, 761 F.2d at 1465 ("[T]he failure to hold a [*Remmer*] hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by outside sources.").

Wilkins thinks we should have taken sworn testimony from Juror #10 (or the CSO) about this conversation. *See* Memo at 21 ("There is no factual evidence to support this speculative theory. No affidavit from Alan Latour that [Juror #10] initiated this private communication first. No sworn testimony from Alan Latour or [Juror #10] of what Alan Latour actual [sic] said[.]"). And he accuses the Court of creating an "elaborate conspiracy theory that CSO Alan Latour's private communication with Juror #10 was some meet and greet, hi and bye contact, and [that] he followed all the procedures of the courtroom." Reply at 34. But we heard from *both* the CSO and Juror #10—each of whom confirmed that the questions came from the juror (and not from the CSO). And, for two reasons, we didn't need to swear anyone in to ensure the veracity of these claims. *One*, even if we assume that the CSO had a motive to lie about his interaction with the juror (which we don't believe), the *juror* certainly had no reason to lie about the conversation because the juror wouldn't have known about the *Remmer* rule—which, as a practical matter, means that she wouldn't have known how important it was (to the *Remmer* inquiry) for her to say that she (and not the CSO) had initiated the conversation. *Two*, the questions *themselves* strongly suggest that the note reflects *the juror's* "concerns" (and not the CSO's). An experienced CSO, after all, would know the answers to some of these basic criminal-law questions. He would've known, for instance, that the jury's verdict must be unanimous and that, as we instruct the jurors in every criminal trial, "punishment is for the judge alone to decide later." 11TH CIR. PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) B10.1 (2022). And, indeed, the juror's questions about punishment reveal a certain hand-wringing—very common among jurors—about the fate of the man upon whom they've been called upon to pass judgment. And the fact of the matter is that a CSO wouldn't really care about the answers to these anxiety-riddled questions because the CSO has no verdict to render and thus no stake in the outcome of the case.

All this aside, though, Wilkins (as we've said) has adduced *no evidence* for his view that the CSO approached Juror #10, that the CSO had a conversation with Juror #10 about the merits of the case, that the CSO poisoned Juror #10's impression of Wilkins, that the CSO lied about all this to the Court, and that the CSO then convinced the juror to lie about it too. We remind Wilkins that, in a § 2255 proceeding, *he* bears the burden of proving his claims. *See Beeman*, 871 F.3d at 1222 ("[A] § 2255 movant 'bears the burden to prove the claims in his § 2255 motion.'" (quoting *Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015))). And that burden is particularly rigorous when a defendant, long after his conviction and without any evidence of misconduct, asserts a *Remmer* claim. *See, e.g.*, *Benjamin*, 958 F.3d at 1137 ("Because Benjamin cannot point to clear, strong, substantial and incontrovertible evidence, that the jury considered extraneous, prejudicial information, the district court did not abuse its discretion in failing to investigate it further." (cleaned up)). Grounds Two and Six are therefore **DENIED**.

## III.    Grounds Three and Five

Wilkins argues in Ground Three that Judge William P. Dimitrouleas[16] "seriously affect[ed] the fairness" of his trial by reading the jury an *Allen* charge, "which . . . [gave] the jury no choice but to return a verdict [that was] impermissibly coercive." Memo at 28. Wilkins separately claims in Ground Five that trial counsel was ineffective "in failing to move for a mistrial and/or objecting to the district court judge's multiple and repeated times, instructing the deadlock jurors to 'continue deliberating' after the *Allen* charges[.]" Reply at 16 (errors in original). He also maintains that Judge Dimitrouleas repeatedly made "coercive comments" to the jury. *Id.* at 17.

---

[16] Although the Undersigned Judge presided over the trial and *some* of the jury's deliberations, for biological reasons that were entirely unavoidable, Judge Dimitrouleas gave the *Allen* charge and took the verdict. *See* 11/7/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 164 at 17 ("[The Court:] I was going to tell the jurors that my wife is going into labor, so I'm going to go to the hospital. And Judge Dimitrouleas, who I've spoken to, will cover any remaining questions and/or the verdict if and when it comes.").

"The Supreme Court held long ago that a trial court may instruct a deadlocked jury to keep deliberating." *United States v. Davis*, 779 F.3d 1305, 1312 (11th Cir. 2015) (citing *Allen*, 164 U.S. at 501–02). Although this practice—known as an *Allen* or "dynamite charge"—has been criticized, the Eleventh Circuit has consistently "approved the use of the Eleventh Circuit pattern *Allen* charge on numerous occasions." *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008); *see also* 11TH CIR. PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) T5 (2022) (setting out the modified *Allen* charge). That said, an *Allen* charge may be improper if, "under the totality of the circumstances, [the court's instruction] was inherently coercive." *United States v. Chigbo*, 38 F.3d 543, 545 (11th Cir. 1994). The Eleventh Circuit has outlined a non-exhaustive, five-factor test for courts to consider in deciding whether "the court's actions created a substantial risk that one or more jurors would be coerced into abandoning their honest convictions[:] . . . (1) the total length of deliberations; (2) the number of times the jury reported being deadlocked and was instructed to resume deliberations; (3) whether the judge knew of the jury's numerical split when he instructed the jury to continue deliberating; (4) whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict; and (5) the time between the final supplemental instruction and the jury's verdict." *Brewster v. Hazel*, 913 F.3d 1042, 1053 (11th Cir. 2019). None of these factors support a finding that Judge Dimitrouleas's instructions were coercive.

*First*, the jury didn't deliberate very long at all. Wilkins concedes that the jury only deliberated from about "9:30 AM [on] November 7, 2019 until 6:47 PM, which was 9 hours of deliberation after a six day trial." Memo at 29–30; *see also* Reply at 19 (same).[17] A nine- or ten-hour deliberation after a

---

[17] The Government candidly reminds us that the jurors also deliberated for a little under an hour the day before. *See* Response at 25 ("The record reveals that the jury began its deliberations at 5:11 p.m. on [November 6, 2019] and went home for the day at 6 p.m., for a total of 51 minutes of deliberations."). We're not quite sure, though, whether the deliberations *actually* began that day because the exhibits weren't ready to be sent back to the jury until about 5:59 PM. *See* 11/6/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 163 at 199. Either

five-day trial isn't nearly long enough for us to find that the *Allen* charge was unduly coercive. *See Posey v. United States*, 416 F.2d 545, 551–52 (5th Cir. 1969) (approving an *Allen* charge "after nine hours and forty minutes of deliberation"); *see also Rubinstein v. Yehuda*, 38 F.4th 982, 996 (11th Cir. 2022) ("While four days of deliberation is a relatively long time, it is not alarmingly so in the context of a complex, two-week trial."). Wilkins, in fact, never even argues that this factor weighs in his favor, *see generally* Memo; Reply—which is reason enough for us to conclude that it doesn't, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

*Second*, the jurors only said that they were deadlocked *twice*, and Judge Dimitrouleas instructed them to resume their deliberations *both* times.[18] The first indication that the jury was deadlocked came at around 1:49 PM on November 7, 2019, when the jury sent a note that read: "We are not unanimous on two of the counts. We are unanimous on five of the counts[.]" 11/7/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 165 at 3. Both sides *agreed*

---

way, even if we added these 51 minutes to the total, that would still mean that the jury deliberated for *less* than ten hours after a five-day trial—which (as we're about to see) is *not* very long at all.

[18] While Wilkins concedes that there were only ever two deadlocks, he insists that Judge Dimitrouleas gave the jury *five* instructions to resume deliberations. *See* Memo at 30 ("[This] is the first of five instructions, and the first of two deadlocks."). In saying so, however, he simply misreads the record (as we'll explain in a moment).

that it was still too early for an *Allen* charge, so they asked Judge Dimitrouleas to send back a note telling the jurors to "[p]lease continue deliberating." *Id.* at 4.

All remained quiet until 4:48 PM, when the jury sent another note: "We have questions about Count 3, parts A and B. Is it possible to give a verdict without specifying which weapon, or if it was A or B?" *Id.* at 5. This note, of course, didn't mention a deadlock, but it does *seem* to indicate that the jury hadn't come to a unanimous decision as to Count 3. Before answering this note, Judge Dimitrouleas and the parties agreed to ask the jury "if they want to continue their deliberations." *Ibid.* Indeed, to *alleviate* any pressure, Judge Dimitrouleas and *both* parties *agreed* to tell the jurors that, "if anybody wants to go home, then [the court] would recess the deliberations until tomorrow . . . at nine o'clock." *Ibid.* Judge Dimitrouleas then gave the jury the following instruction:

> I've got a note from you: "We have questions about Count 3, parts A and B. Is it possible to give a verdict without specifying which weapon or if it was A or B?"
>
> The answer to that is no. You have to be unanimous as to A or B, or both. But you have to be unanimous before you can return a verdict. Now it's five o'clock. You can deliberate as long as you want to, but if someone's tired or hungry and wants to go home, we can recess the deliberations until tomorrow. It's up to you. Does anybody want to go home or have to go home? If so, please raise your hand. Don't see any hands. So, with that, I'll ask you to retire and continue your deliberations.

*Id.* at 7–8. Wilkins insists that the final line of this instruction ("I'll ask you to retire and continue your deliberations") should count as a second (coercive) instruction. *See* Memo at 31. That's frivolous. Judge Dimitrouleas specifically told the jurors that he was willing to let them *stop* deliberating if even one person wanted to go home for the night. Since every member of the jury declined this offer, Judge Dimitrouleas merely affirmed what the jury had already agreed to do: to "continue [their] deliberations."

In any event, this second *Brewster* factor specifically asks us to count "the number of times the jury reported being deadlocked *and* was instructed to resume deliberations[.]" *Brewster*, 913 F.3d at 1053 (emphasis added). The inquiry surrounding the resume-deliberations instruction, in other words,

doesn't just stand alone; it's very much tied to the first clause (*i.e.*, reports of deadlock). The question for us to consider, then, is how many times the jury was told to continue deliberating *in response to* a report of deadlock. This factor thus doesn't direct us to count, for purposes of *Brewster*'s coercion analysis, the number of times the trial judge, in response to *other* inquiries (unrelated to deadlock), told the jurors to continue their deliberations. And that makes sense. Trial judges routinely end their responses to juror notes by directing the jury to return to the jury room and resume their deliberations. Were we to include all these (unrelated and uncoercive) comments in the coercion inquiry, we'd (almost) always find that this second factor weighs in favor of the defendant—something the law plainly doesn't contemplate.

Anyway, at 5:56 PM, the jury sent another note. This time, the jurors confirmed that they were "still completely at a deadlock on two counts." 11/7/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 165 at 9. At this point, the Government requested an *Allen* charge, and defense counsel moved for a mistrial "with respect to the two counts that [the jury] cannot come to an agreement upon." *Ibid.* Judge Dimitrouleas overruled defense counsel's objection and gave the jury an *Allen* charge, reading *verbatim* from the Eleventh Circuit's pattern jury instructions. *Compare id.* at 11–12, *with* 11TH CIR. PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) T5 (2019). Judge Dimitrouleas then added one final sentence that didn't come from the pattern instructions: "And with that," he said, "I'll ask you to retire and continue your deliberations." 11/7/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 165 at 13. No further instructions were given because, at 6:42 PM, the jury sent a final note, informing the Court that it had reached a unanimous verdict on all counts. *See ibid.*

Wilkins asks us to read Judge Dimitrouleas's *Allen* charge as *three separate* instructions because (he claims) the judge asked the jury to "continue your deliberations" three different times. *See* Memo at 33; Reply at 21–23. This (again) is silly. Judge Dimitrouleas gave the jurors the pattern *Allen* charge,

which the Eleventh Circuit has repeatedly sanctioned—and which, yes, tells the jurors on two separate occasions to continue deliberating. He then dismissed the jurors by telling them to resume their deliberations. And he did all this in one sitting, as part of a single instruction, and in response to the jury's penultimate note.

As we've said, then, the jurors only told the Court that they were deadlocked twice, and Judge Dimitrouleas instructed them to keep deliberating both times—the second of these coming as part of the standard *Allen* charge. That's not even close to coercive. *See Woodard*, 531 F.3d at 1364 ("Nothing in the circumstances surrounding the court's reading of the *Allen* charge appears remotely coercive. When the jury first informed the court that it was deadlocked, the court asked the jury to resume its deliberations the following day and dismissed it for the evening. Only after the jury informed the court for the second time that it was deadlocked did the court give the *Allen* charge; and the court did not poll the jury before giving the charge."); *Brewster*, 913 F.3d at 1054 ("One or two, or even three, instructions requiring a deadlocked jury to keep on deliberating might not be a problem, depending on the surrounding circumstances."); *United States v. Anderson*, 1 F.4th 1244, 1269 (11th Cir. 2021) ("Here, it is undisputed that the district court's modified *Allen* charge largely tracked this Court's pattern instruction, which we have approved on numerous occasions.").

*Third*, Judge Dimitrouleas never polled the jurors before he instructed them to keep deliberating, and (just as significant) the jurors never told him how their votes were split. This factor, too, weighs against coercion. *See Rubinstein*, 38 F.4th at 997 ("And here, the other surrounding circumstances weigh toward the [*Allen* charge] being proper. Particularly significant is that the judge did not know of the jury's numerical split when instructing the jury to keep deliberating.").

*Fourth*, Judge Dimitrouleas never implied that the jurors were violating their oaths or otherwise behaving improperly by failing to reach a unanimous verdict on all counts. Here, Wilkins's only argument is that the *Allen* charge *itself* suggests that the jurors have failed at their duties. *See* Memo at

37 ("'[The instruction] was saying to the jury and hold-out jurors 'Your smart and intelligent. Don't make a stupid decision with not finding him guilty. It's gonna make the Criminal Justice System look bad if you fail to find him guilty. . . . [It] will cost taxpayers more money to retry this costly case again, and you will be [to] blame and the public will question your decision about what you based your not guilty verdict upon.'" (errors in original)). Unfortunately for Wilkins, the Eleventh Circuit has repeatedly rejected this argument many times before, holding (as we do now) that the *Allen* charge doesn't "coerce any juror to give up an honest belief[.]" *Anderson*, 1 F.4th at 1269 (quoting *Davis*, 779 F.3d at 1312); *see also United States v. Trujillo*, 146 F.3d 838, 846–47 (11th Cir. 1998) ("We hold that the modified *Allen* charge given here did not unduly coerce any of the jurors into rendering a verdict. This court has adopted this pattern charge, and it specifically requests that 'no juror is expected to give up an honest belief he or she may have as to the weight or effect of the evidence.'"); *United States v. Brown*, 934 F.3d 1278, 1301 (11th Cir. 2019) (affirming a conviction after the district judge read a modified *Allen* charge, which told the jurors that, "obviously, another trial would only increase the cost to both sides"). And, indeed, Judge Dimitrouleas's reading of the pattern *Allen* charge easily distinguishes our facts from *other* cases in which the instructions were found to be unduly coercive. *See, e.g.*, *Brewster*, 913 F.3d at 1055 (disapproving of a "lengthy instruction" in which the trial judge "lectured" the jury and said: "[Y]ou took an oath. I take mine seriously. I hope you do the same."). This fourth factor thus likewise weighs against Wilkins.

*Fifth*, the 45 minutes that passed between Judge Dimitrouleas's reading of the *Allen* charge and the verdict, *compare* 11/7/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 165 at 9, 11 (showing that the *Allen* charge was read shortly after 5:56 PM), *with id.* at 13 (announcing that the jury reached a verdict at 6:42 PM), isn't evidence of coercion, *see Chigbo*, 38 F.3d at 546 ("The speed with which the jury returned its verdict after receiving the modified *Allen* charge [fifteen minutes] does not change our decision."); *United States v. Bush*, 727 F.3d 1308,

35

1320–21 (11th Cir. 2013) (holding that an *Allen* charge wasn't "inherently coercive" even though the jury reached a verdict "[a]pproximately 47 minutes later"); *United States v. Scruggs*, 583 F.2d 238, 241 (5th Cir. 1978) ("[T]he timing complained of [where the jury returned a verdict 48 minutes after the *Allen* charge was given] does not allow us to find that the jury was coerced. We have approved an *Allen* charge that was given after only 65 minutes of deliberation and that was followed by a verdict 25 minutes later." (citing *Andrews v. United States*, 309 F.2d 127, 129 (5th Cir. 1962))).

Grounds Three and Five, in short, are **DENIED**.

## IV.    Ground Seven

In Ground Seven, Wilkins says that his trial counsel was ineffective because he "refused to raise multiplicity of offenses and punishment due to inadequate research and ignorance of the law." Memo at 87. In Wilkins's view, Counts 1 and 3 and Counts 6 and 7 "arise from the same event" and, therefore, violate the Constitution's prohibition against double jeopardy. *Id.* at 92. Wilkins also blames his lawyer for not taking the argument seriously and accuses him of failing "to perform basic research" and not knowing that "mulplicity [sic] punishments were unlawful." *Id.* at 90. Pointing out that Counts 1, 3, 6, and 7 all charge Wilkins with *different* conduct, the Government refers to this claim as "patently frivolous." Response at 46. And, again, we agree.

"An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008). A multiplicitous indictment "violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense." *United States v. Jones*, 601 F.3d 1247, 1258 (11th Cir. 2010). Since an attack on a multiplicitous indictment "is subject to the same standard as a double jeopardy challenge," *United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012), we must decide whether the counts satisfy "the test set forth by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932)," *Williams*, 527 F.3d at 1240. The *Blockburger* test is satisfied—and double jeopardy is *not* implicated—if each count "requires

proof of an additional fact which the other does not." *Davis*, 854 F.3d at 1286 (cleaned up). Simply put, "charges in an indictment are not multiplicitous if the charges differ *by even a single element or alleged fact.*" *Woods*, 684 F.3d at 1060 (emphasis added) (citing *United States v. Costa*, 947 F.2d 919, 926 (11th Cir. 1991)).

Wilkins has raised this claim once before—in the motion he filed to discharge his lawyer a week after trial. *See* Motion to Withdraw Counsel, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Nov. 15, 2019), ECF No. 134 at 2 (arguing that Counts 6 and 7 "charg[ed] the same offense in more than one count"). At the hearing on this motion, Wilkins's lawyer explained that he had done the research on this issue and had concluded that "there was no good-faith basis to file that [motion]." Sealed Motion to Withdraw Hr'g Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Mar. 13, 2020), ECF No. 174 at 23. Since Counts 1 and 3 plainly "charged [Wilkins] with different guns in different counts," we agreed that defense counsel wasn't ineffective for failing to pursue this "frivolous" multiplicity argument. *Id.* at 23–24. We also agreed with counsel that there was no "good-faith basis" to argue that Counts 6 and 7 were duplicative. *Id.* at 24. We reiterate those conclusions here.

Counts 1 and 3, after all, charged Wilkins with illegally possessing two different sets of items on different dates. Count 1 of the Superseding Indictment alleged that, "[o]n or about July 13, 2017," Wilkins, a convicted felon, knowingly possessed "approximately fifty (50) rounds of Winchester 9mm ammunition[.]" Superseding Indictment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Aug. 29, 2019), ECF No. 57 at 1. Count 3, by contrast, charged Wilkins with knowingly possessing "a Taurus Model PT709 Slim 9 mm semi-automatic pistol[ ] and a Russian Makarov 9mm Makarov [sic] semi-automatic pistol" between May 24, 2017, and September 28, 2017. *Id.* at 2. To prove that Wilkins was guilty of Count 1, therefore, the Government had to show that Wilkins possessed fifty rounds of ammunition on July 13, 2017, whereas, to establish Wilkins's guilt on Count 3, the

Government had to prove an entirely different set of facts—that Wilkins possessed a 9mm Taurus and/or a 9mm Makarov between May and September 2017. And, indeed, the Government's evidence at trial showed that Wilkins *separately* possessed these different items at different times and in different places. For Count 1, the Government introduced the surveillance footage from the Walmart—and the testimony of C.S.—which showed Wilkins, with C.S.'s assistance, purchasing the Winchester ammunition on July 13, 2017. *See Wilkins I*, 2020 WL 7294525, at *2 ("On one occasion, Wilkins and CS stopped at a Walmart, where Wilkins calmly pointed out the bullets he wanted and then walked alongside her as she paid for them at the counter.").

But there was no evidence that Wilkins was possessing either the Taurus or the Russian Makarov at the Walmart that day. To establish his possession of *those* items, the Government showed photos and videos of Wilkins holding the Taurus on different days and in different places. *See Wilkins II*, 2022 WL 98748, at *1 (explaining that Wilkins and C.S. "often carried a Taurus 9mm pistol" when they "[sold] crack cocaine together"); 11/4/2019 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 161 at 77–83 (publishing pictures and videos of Wilkins holding the Taurus). And the Government corroborated this photographic and video evidence with the testimony of C.S., G.H. (Wilkins's other girlfriend), and Armstrong[19]—all of whom attested that Wilkins possessed one or both of these weapons on different days and in different places. *See, e.g.,* 10/31/2019 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 160 at 154–55 ("[The Prosecutor]: You saw [Wilkins] with a gun? [G.H.]: Yes. . . . Q: Okay. And how often did Christopher Wilkins have that gun? A: When he came out of the halfway house."); 11/4/2019 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 161 at 22 ("[The Prosecutor]: When you would pick [Wilkins] up, did you bring, at his request, [a gun]? [C.S.]: Yes. . . . Q: What kind of gun was it? A: A Taurus."); 11/5/2019 Trial Tr.,

---

[19] Armstrong (who never mentioned the Taurus) was the only witness to testify about the Makarov.

*United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 162 at 163 ("[The Prosecutor]: Okay. And do you remember whether [the gun] had any markings on it? . . . [Armstrong]: I remember seeing 9, 'Russia 9.'"). Again, none of these witnesses ever suggested that, when he was possessing the Taurus or the Makarov, he was *always* simultaneously possessing the Winchester ammunition C.S. bought for him at the Walmart. That's plainly sufficient to satisfy the *Blockberger* test. *See Jones*, 601 F.3d at 1259 ("[W]here a defendant has possessed different weapons at different times or places, the government may treat them as separate units of prosecution and charge multiple counts."); *United States v. Miller*, 156 F. App'x 281, 291 (11th Cir. 2005) ("Because the district court correctly concluded that if the government presented evidence that Miller separately possessed the weapons and ammunition charged in the indictment he could properly be convicted on each count, the district court did not err when it denied Miller's pre-trial motion to dismiss the indictment as multiplicitous.").

Counts 6 and 7 are no more problematic. Wilkins claims that Count 6 was a lesser-included offense of Count 7 because (he says) both required the Government to prove that he "knowingly use[d] intimidation, threaten[ed] or corruptly persuade[d] another person or attempt[ed] to do so or engage[d] in misleading conduct towards another." Memo at 93. We agree that Counts 6 and 7 required the Government to prove *nearly* identical elements, but the *Blockburger* test is satisfied if each count has a "single element or alleged fact" that's different. *Woods*, 684 F.3d at 1060. And Counts 6 and 7 scale this very low bar. Although Counts 6 and 7 both charged Wilkins with violating 18 U.S.C. § 1512(b) by tampering with C.S., the Government had to prove different elements with respect to each count. Count 6 alleged that Wilkins "influence[d], delay[ed], or prevented the testimony of C.S. in an official proceeding, that is, the *Grand Jury's investigation* of [Wilkins]," in violation of 18 U.S.C. § 1512(b)(1). *See* Superseding Indictment, *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Aug. 29, 2019), ECF No. 57 at 4 (emphasis added).

Count 7, in contrast, required the Government to show that Wilkins "hinder[ed], delay[ed], or prevent[ed] the communication by C.S. *to a law enforcement officer* of the United States relating to the commission or possible commission of a Federal offense," in violation of 18 U.S.C. § 1512(b)(3). *Id.* at 4–5 (emphasis added). In other words, whereas the Government had to prove that Wilkins tampered or interfered with an "official proceeding" in Count 6, *see* 18 U.S.C. § 1512(b)(1), it had to show (for Count 7) that he tampered or interfered with C.S.'s "communication to a law enforcement officer of the United States relating to the commission or possible commission of a Federal offense," *id.* § 1512(b)(3). Count 6's official-proceeding element is thus missing from Count 7, just as a central element of Count 7—communication with a federal officer—is missing from Count 6. Since Counts 6 and 7 have different elements (and, indeed, are based on different subsections of the same statute), they satisfy the *Blockburger* test. *See United States v. Ronda*, 455 F.3d 1273, 1288 (11th Cir. 2006) ("Unlike the stricter 'an official proceeding' requirement that appears in [§ 1512(b)(1)–(2)], § 1512(b)(3) requires only that a defendant intended to hinder, delay, or prevent communication to any 'law enforcement officer or judge of the United States.' . . . § 1512(b)(3) does not require that a federal investigation be initiated nor that an official proceeding be ongoing." (citing *United States v. Veal*, 153 F.3d 1233, 1248, 1252 (11th Cir. 1998))); *United States v. Ho*, 651 F. Supp. 2d 1191, 1197 (D. Haw. 2009) (Seabright, J.) ("Accordingly, every statement to a law enforcement officer is not a statement in a future official proceeding, and every violation of § 1512(b)(3) is not a violation of § 1512(b)(1).").

Because Wilkins's position is meritless, counsel cannot be blamed for having failed to advance it. *See Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) ("Failing to make a meritless objection does not constitute deficient performance."). We therefore **DENY** Ground Seven.

## V.    Ground Eight

In Ground Eight, Wilkins says that his lawyer was ineffective for failing to cross-examine C.S. "with material evidence as to her vendetta against Defendant and credibility because of her mental

health." Memo at 96. Wilkins claims "that the Government was triggering [C.S.'s] suicidal attempts with driving her crazy by threatening her and coercing her to fabricate her grand jury testimony with stirring up the vendetta she had with Defendant Wilkins who is the father of her son, because he was now dating her friend [G.H.]." *Id.* at 96–97.[20] Wilkins contends that, if his lawyer had brought up C.S.'s "mental disorders," the jury would have been less likely to believe her testimony because "many types of emotional or mental defects may materially affect the accuracy of testimony[.]" Reply at 57. The Government responds that counsel "made the strategic decision not to cross-examine CS about these issues," and it maintains that this strategic decision was reasonable because cross-examining C.S. about her mental health could've "backfired." Response at 52–53.

---

[20]        We reject out of hand Wilkins's claim that his lawyer failed, in cross-examining C.S., to show that she was jealous about his relationship with her friend (G.H.). *See, e.g.*, 11/5/19 Trial Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla. Feb. 24, 2020), ECF No. 162 at 81 ("[Defense Counsel]: Now, after that, was [Wilkins] staying with [G.H.]? A: Yes. Q: Is that a dividing line in your feelings towards him? A: What do you mean? Q: Well, before them, did you think he was all yours? A: Yeah, at one point. Q: Okay. After that, did you have to share him with [G.H.]? . . . A: Yes. Q: And did you tell the jury, in your first day of testimony, that that made you feel upset and jealous? A: Yes.").
          We also agree with the Government that Wilkins's lawyer wasn't *precluded* from cross-examining C.S. about her mental-health issues. *See* Response at 51 ("There is nothing indicating that Movant's counsel was prevented from cross-examining CS about her mental health issues."). Instead, the record seems clear that counsel *chose* not to pursue this line of questioning—probably because it would have been a bad look for the harassing ex-boyfriend to vigorously cross-examine the female victim about her struggles with mental health. *Cf. Brown v. Dixon*, 591 F. Supp. 3d 1251, 1279 (S.D. Fla. 2022) (Altman, J.) ("[D]efense lawyers often use special care in examining witnesses who (as here) claim to have been abused. And with good reason: lawyers don't want to look as though they're beating up on sympathetic victims."). And (as we're about to explain) we will rarely second-guess these in-court strategic decisions. *See, e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) ("The decision as to whether to cross-examine a witness is 'a tactical one well within the discretion of a defense attorney.'" (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985))). In any event, Wilkins wasn't "denied the right of effective cross-examination" simply because his lawyer chose not to ask certain (very provocative) questions. *Davis v. Alaska*, 415 U.S. 308, 319 (1974); *see also Dorsey v. Chapman*, 262 F.3d 1181, 1190 (11th Cir. 2001) ("While it is true that a defendant's right of confrontation is violated when he is prohibited from pursuing areas of cross-examination that may undermine the credibility of the witness, here Dorsey was not prohibited from pursuing any line of inquiry, but strategically chose not to." (cleaned up)).

In the ineffective-assistance context, we "strongly presume" that defense counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. We thus do not second-guess an attorney's strategic decision unless the error is "so egregious that no reasonably competent attorney would have acted similarly." *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1239 (11th Cir. 2011). How and when to cross-examine a witness is one of the most important tactical decisions a lawyer will make during a trial—so, absent egregious error, we generally defer to the lawyer's professional, in-court judgment. *See Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) ("The decision as to whether to cross-examine a witness is 'a tactical one well within the discretion of a defense attorney.'" (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985))); *Ether v. Dixon*, 2022 WL 1908918, at *18 (S.D. Fla. June 3, 2022) (Altman, J.) ("[T]he decision to impeach (or not impeach) a particular witness with a specific piece of evidence is precisely the kind of strategic choice we rarely second-guess on collateral review.").

As with Grounds One and Seven, we've already heard (and rejected) Wilkins's complaints about his lawyer's cross of C.S. Fortunately, we don't have to speculate about counsel's reasons for not delving into C.S.'s suicidal ideations because he already told us, at the hearing on Wilkins's motion to withdraw him, why he chose not to ask those questions:

> The particular call that Mr. Wilkins was pointing out, I didn't think that I could impeach her. It was too broad, these statements that "I'm upset, I'm suicidal," as to why.
>
> And the point was, even she many times referred to Special Agent Connors as, I believe, "that bitch," that pointed out how upset she was that the government was pressuring her to testify in this case. There was plenty of evidence about that, without giving her the opportunity to say something like, "Yes, I was suicidal because of what [Wilkins] was doing. It was abundantly evident that she was pressured, by her own statements. And then, if she had denied that, I have the transcript to impeach her. But I wasn't going to ask a wide-open question like that, where I don't have basically ammunition to impeach her with, when I've already done it with other portions of the transcript.

Sealed Motion to Withdraw Hr'g Tr., *United States v. Wilkins*, No. 19-80032-CR-ALTMAN (S.D. Fla.

Mar. 13, 2020), ECF No. 174 at 16. Counsel, in short, chose to avoid this issue for two reasons—(1)

because he had already elicited plenty of testimony from C.S. about the degree of pressure the

Government had imposed on her to testify against Wilkins and (2) because this line of cross could've

damaged his client—perhaps irreparably—by allowing C.S. to claim that *Wilkins* (*his* threats, *his*

harassment, *his* intimidation), and not the Government, was the true source of her anxieties.

We've already found these justifications reasonable and now reiterate (and incorporate) our

findings here. As we said at that same motion-to-withdraw hearing:

> First of all, to question a female witness in a case involving a male defendant who's
> alleged to have threatened her and oppressed her, in some ways, over and over again
> in front of a jury that involved both men and women, to try to blame her and make
> her seem crazy because of her suicidal thoughts, seems to me a very poor idea.
>
> In any event, it was an idea that clearly could have backfired in a number of ways. One
> of which is, the jurors would just find it distasteful that you and your lawyer were
> bringing out all this very dirty laundry with respect to her personal mental state.
>
> Second, and more importantly, that it gave her the opportunity, as Mr. Chapman said,
> to come back with, "Of course, I'm suicidal. Look at this guy that I'm dealing with and
> all the horrible things he's saying to me.[21] And let me point you back to this text
> message where he told me to go get a black dress for my own funeral and called me a
> hoe, and all these other horrible things he said to me, who wouldn't be suicidal under
> those circumstances?"
>
> Instead, it seemed a much better strategy to do as [defense counsel] did, which was to
> stick to all the facts he could always impeach her on. And, frankly, he did a tremendous
> job of having one question, she denied it, or she couldn't remember, and he always
> had the exact citations ready in a previous transcript to come back to her and impeach
> her with it.
>
> And it wasn't unreasonable—and this is the third point—to think, given all of that
> impeachment evidence, that was clearly proven, of situations where she was either
> changing her story or not remembering the story, to refuse to impeach her with
> something where he didn't—excuse me—refuse to question her with something that
> he didn't then have a backup impeachment cite to go to. In other words, with so many
> of the other impeachment moments, when she said X, Y, or Z, he would say, Well,
> here's someplace where you said not X, Y, or Z. Great impeachment.

---

[21] *See generally Wilkins I*, 2020 WL 7294525, at *8–9 (outlining Wilkins's violent threats against C.S.).

> With this one, if she had said, "I was suicidal because of Mr. Wilkins and all the things
> he's done to me," he had nothing to fall back to, to impeach her with that. And it
> wasn't unreasonable to refuse to get into that.

*Id.* at 19–20.

Because counsel's reasons for not pressing C.S. on her mental-health issues were plainly

reasonable, we **DENY** Ground Eight. *Cf. Chandler*, 218 F.3d at 1315 ("And because counsel's conduct

is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must

establish that no competent counsel would have taken the action that his counsel did take.").[22]

### EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case because Wilkins's claims are meritless on

their face. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's

factual allegations or otherwise precludes habeas relief, a district court is not required to hold an

evidentiary hearing.").

### CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a

substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA,

therefore, the movant must show that "reasonable jurists would find the district court's assessment of

---

[22] Still resisting, Wilkins insists that counsel should have brought up C.S.'s suicidal thoughts as proof
that she was suffering from a mental illness—and that, as a result, she was an unreliable witness. *See*
Memo at 102 ("[C]ertain forms of mental disorders have high probative value on issues of credibility
. . . many types of emotional or mental defects may materially affect the accuracy of testimony[.]").
We've already explained why cross-examining C.S., who had been relentlessly harassed by Wilkins,
about her mental health would've been a bad idea. We add here only that this type of cross-
examination was completely unnecessary because (as we've explained) counsel had already elicited
plenty of other testimony for his view that C.S. wasn't a reliable witness. *Cf. United States v. Carson*, 447
F. App'x 925, 929 (11th Cir. 2011) (holding that "excluding evidence of [a witness's] suicide attempts"
wasn't error "because the jury was able to evaluate Wilbert's credibility and bias through other facts:
his past drug conviction, prior inconsistent statements about who was transporting how much
marijuana from Texas, his plea agreement, and the *testimony from Rosemary Carson that Wilbert told her that
the government was exerting pressure on him to testify*" (emphasis added)).

the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Because reasonable jurists wouldn't debate the correctness of our decision today, we won't issue a COA.

* * *

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Motion [ECF No. 1] is **DISMISSED** as procedurally defaulted with respect to Grounds One and Four and **DENIED** on the merits as to the remaining claims. Any request for a COA is **DENIED**. Any pending motions, including any requests for an evidentiary hearing, are **DENIED**. All deadlines are **TERMINATED**. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on July 12, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Christopher Wilkins, *pro se*
        counsel of record

45